## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

PETER J. TERVEER,               )
231 W. Michigan Ave.            )
Fremont, Michigan 49412         )
                                )
    Plaintiff,            )
                                )          Case Number:
    v.                    )          Assigned Judge:
                                )          Description:
JAMES H. BILLINGTON             )          Assign. Date:
in his official capacity as Librarian   )
of Congress, Library of Congress    )
101 Independence Ave., S.E.     )          JURY TRIAL DEMANDED
Washington, D.C. 20540-2120     )
                                )
    Defendant.            )
_____ )

### COMPLAINT

Plaintiff, PETER J. TERVEER (hereinafter "Plaintiff" or "TerVeer"), by and through

undersigned counsel, hereby submits this Complaint against JAMES H. BILLINGTON

(hereinafter "Defendant"), and as grounds therefore, states as follows:

### NATURE OF THE ACTION

1.  In February 2008, Plaintiff was hired as a Management Analyst in the Auditing Division

    of the Library of Congress Office of the Inspector General. The Plaintiff's work was well

    received and he rose to the GS-11 grade level by March 2011.  Although the Plaintiff and

    his first-level supervisor, John Mech, shared a friendly relationship, Mech's attitude

    toward the Plaintiff became hostile after learning that the Plaintiff is homosexual. A

    series of instances of verbal and electronic harassment followed. Mech imposed his sex

    stereotypes and fundamentalist religious beliefs on homosexuality upon the Plaintiff,

    resulting in a hostile working environment. After Plaintiff raised the issue of

    discrimination with Mech, the hostile behavior increased. The Plaintiff had informed his

second-level supervisor, Nicholas Christopher, of the hostile behavior and inaccurate ratings, but Christopher made no effort to inform the Plaintiff of his rights or agency procedures for reporting discrimination and harassment and ignored the Plaintiff's concerns. The Plaintiff was denied promotion, transfer opportunities, and was ultimately terminated.

2.  Plaintiff brings this claim pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, to remedy sex stereotyping, gender discrimination, religious discrimination, and retaliation in employment. Defendant has also violated Plaintiff's right to due process of law and, in the alternative to his Title VII discrimination claims, his right to equal protection under the law, both of which are guaranteed by the Fifth Amendment to the United States Constitution. Defendant's actions also contravene the Library of Congress Act, 2 U.S.C. § 140. Finally, Defendant's actions in this case contravene Special Announcements 10-5, 11-02 and Library of Congress Regulations (LCR) 2010-2, 2023-1, and LCR 2023-2, policies prohibiting sexual and other forms of harassment at the Library of Congress.

### JURISDICTION AND VENUE

3.  This case arises under the Constitution and laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution, 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 2000e-5(f), 2000e-16.

4.  Venue is proper in this judicial district under 28 U.S.C. § 1391(b), (e) and 42 U.S.C. § 2000e-5(f) because (1) the Library of Congress is within this judicial district, (2) the events or omissions giving rise to Plaintiff's claim for relief occurred in this judicial district, (3) the unlawful acts are alleged to have been committed in this judicial district, (4) the records relevant to such acts are maintained and administered in this judicial

district, and (5) Plaintiff would have continued to work in this judicial district but for Defendant's alleged unlawful acts.

5.   Plaintiff has fulfilled all conditions precedent under Title VII prior to instituting this lawsuit, as necessary, and has otherwise exhausted his administrative remedies.

## STATEMENT OF FACTS

6.   On or about February 4, 2008, TerVeer was hired by the Library of Congress (LOC) as a temporary employee in the Office of the Inspector General (OIG).  By March 19 of that same year, he was awarded his first of three "On-the-Spot Awards" in recognition of "[e]xcellent performance in completing disbursing office audit tests."  Because of his exemplary work product, TerVeer's temporary assignment was extended through December 6, 2008. By October 26, 2008, TerVeer had been hired as a full-time employee at the GS-7 level.  By January 30, 2009, TerVeer was placed on the LOC career ladder.

7.   TerVeer excelled at the OIG and continued to be known for his exemplary work product. On March 19, 2009, he received his first of three Within Grade Increases (WIGIs) in salary and on March 29, 2009 was promoted to level GS-9-1.

8.   Mech is a religious man who is accustomed to making his faith known in the workplace. He keeps a Bible on his desk and, on occasion, interjects a non-secular tone into his written and oral communications.  One such instance occurred on June 24, 2009 in the context of a light-hearted political discussion. Mech told TerVeer that "putting you … closer to God is my effort to encourage you to save your worldly behind[ ] !!!!!!".  upon reading this message, TerVeer became concerned that Mech's religious beliefs were contrary to his own, and that this might negatively affect his employment at the LOC, especially if Mech were to learn that TerVeer is homosexual.

9.  Previously, TerVeer had begun to foster a close relationship with Mech and his family. Mech and TerVeer attended a University of Maryland football game along with Mech's wife and son. Mech facilitated an introduction to his single daughter, Katie Mech, and the two became "friends" on the social networking website Facebook in January of 2009.

10. TerVeer enjoyed a friendly exchange of Facebook messages with Katie Mech, until the first week of August 2009, when his relationship with Katie Mech and her father John Mech took a dramatic turn for the worse.  Unbeknownst to TerVeer, Facebook had altered its privacy settings, which provided TerVeer's Facebook "friends" access to Facebook pages that he indicated he "liked." One such page was "Two Dads," which fosters support for families combating bullying from people who express hatred and prejudice towards homosexual parents.  After viewing TerVeer's indication of support for this organization, Katie Mech posted the comment "Don't tell me you're weird like that" to TerVeer.

11. TerVeer responded offline by confirming Katie Mech's belief that he was homosexual, but assured her that he was not "weird." He expressed that it was hurtful to consider that she believed homosexual men to be weird.  Katie Mech's final response to this conversation was to promptly terminate her online Facebook connection with TerVeer.

12. Shortly after this interaction with Katie Mech, TerVeer received an email from John Mech mentioning Katie and containing photographs of assault weapons along with the tagline, "Diversity: Let's Celebrate It." John Mech's religious intimations immediately became routine.  Now, at the beginning of almost every work-related conversation, Mech would engage in a religious lecture to the point where it became clear that Mech was targeting TerVeer by imposing his conservative Catholic beliefs on TerVeer throughout

the workday.  TerVeer proclaims a Christian faith, but one that is accepting of his sexual orientation.

13. Mech's working relationship with TerVeer had changed; he was now treated differently. Mech's supervision style went from being detailed with specific instructions to one that was more hands-off.  When instructions were given, they were now ambiguous and without clear communication of what he or OIG Management expected. TerVeer was no longer "one of the guys"; his orientation as homosexual had removed him from Mech's preconceived definition of male.  TerVeer was no longer invited to Mech family outings and was clearly no longer a suitable match for Mech's daughter.

14. At work, the religious diatribes escalated to compromise TerVeer's professional relationship with Mech.  Out of respect for Mech's position of authority, TerVeer publicly made light of the lectures, but knew that he must take action to protect his career and remove himself from a work environment where he felt harassed.

15. In Fall 2009, meetings began within the OIG to discuss an audit inquiry that would eventually become known as the ILS Voyager Internal Control Project ("Voyager").

16. Aside from creating a hostile environment in which he imposed his religion and sexual stereotypes, Mech began creating a paper trail to support his ultimate goal of driving TerVeer out of the LOC.  Beginning in December 2009, Mech began assigning TerVeer tasks associated with Voyager that were beyond TerVeer's then-current experience level. The project was a large and complex one.  A previous project of similar scope and magnitude had been staffed with a team of six highly qualified professionals and took more than a year to complete.  However, TerVeer was the sole employee assigned to Voyager. Rather than initiate the project according to the OIG standard procedure, which included a New Project Memorandum detailing the scope of the project, Mech simply

held a brief meeting to discuss the format of the project.  This deviation from standard

procedure left TerVeer without clear objectives or milestones to gauge his progress and

performance.

17. In March 2010, TerVeer received a WIGI based on his work performance during the

previous year and was promoted in April for his work performance to GS-11.  On May 6,

2010, he was awarded his second "On-the-Spot Award."   However, while Voyager

continued to dominate TerVeer's workload, Mech began piling on more work to ensure

that TerVeer's performance would falter.

18. The religious indoctrination continued.  On June 21, 2010, Mech confronted TerVeer

directly regarding his homosexuality and its non-conformance with Mech's conservative

religious beliefs.  Mech called an unscheduled meeting, lasting more than an hour, for the

stated purpose of "educating [TerVeer] on Hell and that it is a sin to be a homosexual…[,

that] homosexuality was wrong[,] and that [TerVeer] would be going to Hell."   Mech

began reciting Bible verses to TerVeer in support of his lecture, telling TerVeer, "I hope

you repent because the Bible is very clear about what God does to homosexuals.

*Leviticus* 18:22 states, 'Thou shall not lie with mankind, as with womankind: it is an

abomination.' *Leviticus* 20:13 states, 'If a man lies with a man as one lies with a woman,

both of them have done what is detestable. They must be put to death; their blood will be

on their own heads.' *Romans* 1:26-27 states, 'For this reason God gave them up to vile

passions.  For even their women exchanged the natural use for what is against nature.

Likewise also the men, leaving their natural use of the woman burned in their lust for one

another, men with men, committing what is shameful and receiving in themselves the

penalty of their error which was due.' 1 *Corinthians* 6:9-10 states, "Do you not know that

the wicked will not inherit the kingdom of God? Do not be deceived: Neither the sexually

immoral nor idolaters nor adulterers nor male prostitutes nor homosexual offenders nor

thieves nor the greedy nor drunkards nor slanderers nor swindlers will inherit the kingdom of God.'"

19. The religious lecturing continued, with Mech stating that TerVeer can never succeed as a homosexual because homosexuality is "against God's law," among other similar comments.  Shortly after this episode, TerVeer discussed these issues with a co-worker.  After a meeting between the co-worker and Mech, TerVeer received an email communication from her, stating, "I think [Mech] will stop preaching Jesus to you."

20. Just four days later, on June 25, 2010, TerVeer received his annual review from Mech.  Despite his earning promotions and recognition for achievement during the review period of March 2009 through March 2010, the review was harsh.  TerVeer found that many of the comments in the report did not accurately reflect the quality of the work he had completed and were well below what he had expected.  The review was not impartial, but instead motivated by Mech's adverse religious beliefs and sexual stereotyping.  Working within the scope of the review process, TerVeer directly questioned Mech regarding the purpose of the continuous religious lecturing and unfair treatment that began after Mech learned TerVeer was homosexual.

21. Mech became incensed by TerVeer's questioning, and Mech then vehemently denied that TerVeer's homosexuality and personal religious views had impacted his impartiality with regard to TerVeer's work and performance.  Mech refused to reconsider any of the comments made in the report and chided TerVeer by accusing him of trying to "bring down the Library." TerVeer explicitly told Mech that he believed his poor review was based upon their divergent religious beliefs.

22. Mech again called TerVeer into a meeting on June 26, 2010, stating, "[W]e have to get this hammered out." Mech claimed that he had made a fair assessment, which would stand as written, and demanded that TerVeer sign the report. TerVeer reiterated that he believed the report to be inaccurate and motivated by Mech's religious views, and accordingly refused to sign it.

23. On June 28, 2010, Mech convened a meeting between himself, TerVeer, and Nicholas Christopher, Mech's immediate supervisor.  The meeting addressed TerVeer's refusal to sign his review, but Mech did not address TerVeer's statements that religious beliefs and sex stereotyping had motivated the poor review.  Christopher instructed TerVeer to do what he was told by his supervisor.

24. The following day, TerVeer invited Christopher to join him for a cup of coffee.  During this meeting, TerVeer expressly told Christopher that Mech had been lecturing him about religion and that he believed he was the victim of discrimination in the workplace because his sexual orientation did not conform to Mr. Mech's religious beliefs.  TerVeer sought advice from Christopher because earlier, in May 2009, after learning that Christopher also identified as homosexual, TerVeer had confided in Christopher and told him he was homosexual.

25. TerVeer's trust was ultimately misplaced. At this meeting, Christopher told TerVeer that because he did not personally see any of the complained behavior, he was forced to believe that Mech was correct and telling the truth.  Christopher told TerVeer that, in his opinion, employees do not have rights. Christopher failed to take appropriate remedial action and failed to contact the Office of Opportunity Inclusiveness and Compliance (OIC) in accordance with LOC policy.  Christopher failed to advise TerVeer of appropriate complaint procedures.

26. Mech embarked on a campaign of retaliation in response to TerVeer's allegations of discrimination.  With Christopher's blessing, Mech placed TerVeer directly under his supervision for Voyager and informed TerVeer that he would be subjected to heightened scrutiny.  TerVeer witnessed that he was being treated differently from his peers.  Mech continued to interact with TerVeer in a hostile manner, and verbally assaulted TerVeer when TerVeer sought clarification on his work assignments.

27. In December 2010, Mech prepared an evaluation of Voyager that broke with standard operating procedure, because the project was not complete.  The review was extremely negative in nearly every category.  When TerVeer discussed the review with Mech, he asked Mech directly if he continued to refuse to accept TerVeer's homosexuality.  In response, Mech stated, "I don't care, I had a conversation with you—that is my business—but this has put you in a position where you are under a closer watch, and you are not to question me—this is how it is.  Regardless, you do not question management."  When questioned regarding his religious beliefs and TerVeer's homosexuality, Mech stated that he was "damn angry" at TerVeer for threatening to bring a claim for wrongful discrimination and harassment. He also stated to TerVeer: "[Y]ou were going to string me out to dry, made accusations, put me in a position risked [sic] my job and position, and now this is the result." He finished by saying, "You are to do as you are told and not question me or management in this office. You do not have rights, this is a dictatorship."

28. Mech demanded that TerVeer sign the performance review regardless of the fact that it was premature, the project was unfinished, and the review of TerVeer's work was untimely.

29. Mech continued to manufacture a negative paper trail of TerVeer's performance in February 2011, when Mech created another negative performance evaluation entitled, "OCGM Project Performance," based upon incorrect facts and mischaracterizations.  A copy of this evaluation was forwarded to Christopher, among others.

30. TerVeer reached out to Christopher on February 22, 2011 regarding the inaccurate report. He stated in an email, "I am scared of his reprisal if I even attempt to present this information and am not sure where to turn.  [Mech] has exaggerated the facts on this to the point that I am not sure how to handle it anymore.  I hope you understand that I would not come to you like this if I did not feel that it was of the utmost importance. [Mech] simply gets so angry every time he deals with me.  I feel like I am in the middle of a 'gotcha' sort of supervision vs. an environment that fosters hard work and creativity."

31. On March 9, 2011, Mech notified TerVeer that he was being placed on a 90-day written warning in accordance with LCR 2017-2, Section 5.D.1.  A negative report following the review period would result in a denial of his level GS-11 WIGI.

32. Christopher came to TerVeer in early March and instructed him that, due to his prior heated discussions with Mech, it was necessary for TerVeer to participate in an Employment Counseling Program to learn how to properly address his supervisors.  He was taken to Ms. Susan Diamond's office for this counseling.

33. After the initial meeting between TerVeer, Christopher, and Diamond, TerVeer returned to Diamond's office on March 14, 2011, without Christopher, to relay to her the extreme stress he was experiencing due to the discrimination by Mech.  Diamond immediately referred TerVeer to Naomi Earp, the Director of the OIC.

34. TerVeer met with Earp on March 16, 2011 and initiated the EEO process.  During this meeting he detailed the discrimination he was enduring.  In response, Earp telephoned Christopher and informed him of TerVeer's statements, including his specific allegations of religious and sex discrimination.  Christopher informed Earp that he would personally counsel Mech regarding these issues.

35. Earp was personally familiar with TerVeer's work product from an earlier "MYAEP" project.  Based upon her positive impression of his work, Earp believed TerVeer would benefit from a transfer from OIG to OIC under her supervision.  Earp asked if OIG would approve this transfer during her telephone call with Christopher.  Christopher's response to Earp was that TerVeer was on track to be terminated within six months and that he would not approve the transfer.

36. On June 24, 2011, Mech submitted his evaluation of the 90-day written warning for the GS-11-1 grade level, which found TerVeer's work to be only minimally successful and denied his WIGI.  This evaluation ignored positive feedback that Mech had received regarding TerVeer's work from other LOC employees who had supervised his work during the relevant period.

37. Mech learned from Christopher that TerVeer was planning to appeal Mech's denial of TerVeer's recent WIGI.  In response, Mech convened a meeting with TerVeer and his co-workers, putting TerVeer on the spot regarding his intent to appeal.  Mech demanded that TerVeer disclose to his co-workers what he intended to do in response to the denial of his WIGI and subjected him to a hostile and abusive interrogation until TerVeer capitulated and disclosed the details regarding his intent to appeal.  The public spectacle was humiliating, unnecessary, and in violation of LOC policy and procedure.  TerVeer was shocked and embarrassed by Mech's actions.

38. TerVeer submitted a Request for Review of Performance Evaluation and Denial of Within Grade Increase to Christopher on June 30, 2011.  Christopher refused to change the performance evaluation and denied the WIGI.

39. The stress of TerVeer's hostile work environment took its toll on TerVeer both mentally and physically.  TerVeer required medical assistance and counseling as a direct result of his work environment.  Upon instruction from these medical professionals, TerVeer took paid sick leave from August 19, 2011 through September 23, 2011.

40. On September 28, 2011, TerVeer filed an Allegation of Discrimination with the LOC Equal Employment Opportunity Complaints Office (EEOCO) pursuant to LCR 2010-3.1, Section 4. It was assigned as Case No. 0164.

41. Following the filing of the discrimination complaint, Mech and Christopher intentionally took steps to prevent TerVeer from advancing his case against them.  They prevented access to documents and other data, while continuing to harass, intimidate, and retaliate against TerVeer.  TerVeer was criticized and penalized at work for taking time, pursuant to LOC policy, to prosecute his administrative action in accordance with LCR 2010-3.

42. Christopher demanded that TerVeer request permission from the very supervisors he had filed a complaint against before working on his administrative action during the workday. Even though TerVeer reminded Christopher of the public humiliation that had resulted the last time Mech was made aware of TerVeer's intention to file an appeal of a performance review, Christopher demanded that the supervisors be consulted. Christopher also shared emails between TerVeer and Christopher on this subject with Mech.

43. On numerous occasions, Christopher followed and/or filmed TerVeer while he was off-duty and away from the LOC.  These tactics were designed by Christopher to frighten and humiliate TerVeer, and were in retaliation for TerVeer's discrimination action.

44. On or about October 12, 2011, TerVeer could no longer continue working at the LOC and took additional leave to continue medical treatment and attempt to deal with the emotional stress created by Mech and Christopher's discriminatory treatment.  TerVeer qualified for Family Medical Leave (FML) on November 7, 2011, retroactive to October 12, after providing confirming documentation from his healthcare providers.

45. Formal approval for FML was delayed due to the LOC's failure to provide TerVeer with the proper application form, which was only available through the Library.   During this delay, retaliation continued in the form of the Defendant's initiation of a formal inquiry into TerVeer's actions on November 2, 2011, including allegations that he was absent without leave (AWOL) due to his departure on October 12, 2011.  Prior to initiation of the formal inquiry, the LOC was in possession of documentation from TerVeer's doctors confirming his medical condition and was aware that TerVeer was in the process of seeking formal approval for FML.

46. The formal inquiry further questioned why TerVeer had failed to inform the harassing supervisor directly of his intention to work on his discrimination complaint during work hours in accordance with LOC policy.

47. TerVeer filed his formal complaint alleging discrimination on November 9, 2011.

48. The allotted unpaid leave under the Family Medical Leave Act ended on or about January 3, 2012 and, shortly thereafter, Christopher prepared a letter to TerVeer declaring him to

be AWOL from work and directing him to return to duty. This letter stated, "…regardless of any health-related issue that you may be experiencing, your prolonged absence has had a negative impact on the Office of Inspector General (OIG), in that the office cannot complete its annual audit plan. The Library can no longer absorb this negative impact to the efficiency and economy of the OIG. Therefore, you are directed to immediately report for duty or contact me immediately to discuss your return to duty status. You are also advised that any further request for LWOP (leave without pay) will not be considered at this time."

49. Although TerVeer responded to Christopher that he would follow up with his doctors regarding his medical status, the letter from Christopher was quite clear: no additional leave would be granted and TerVeer needed to return to duty. Prior requests for transfer had been denied and it was his supervisors' stated goal to run him out of the LOC. If TerVeer were to remain employed by the LOC, he would need to return to work under the direct supervision of Mech and Christopher.

50. Due to his lack of funds, TerVeer was unable to continue medical care or even pay the deductible required by his healthcare providers.

51. LOC Inspector General Karl Schornagel corresponded with TerVeer on March 29, 2012, informing TerVeer that he was considered AWOL and that he would be terminated from the LOC on April 6, 2012 due to his failure to return to duty.

52. TerVeer perfected an appeal of this adverse action on or before April 5, 2012. The appeal remains pending. Regardless of this appeal, the decision to terminate TerVeer has not been stayed pending a final decision.

53. On May 8, 2012, the LOC issued its final agency decision from the Librarian denying TerVeer's claims of discrimination.

54. TerVeer was subjected to a hostile work environment and continued harassment from Mech based upon religious affiliation, sex stereotyping, and sexual orientation. Christopher, Mech, and other supervisors failed to inform TerVeer of his right to file a discrimination claim and retaliated against TerVeer because he sought to and ultimately did file a discrimination claim.  The work environment became too hostile for TerVeer to continue working under Mech or Christopher's supervision, and his requests for transfer were denied.  TerVeer was constructively terminated on April 6, 2012 because he was unable to return to a workplace where he had to confront constant discriminatory treatment from Mech and Christopher.

## COUNT I

### (Title VII – Sex Discrimination)

55. TerVeer is a homosexual male whose sexual orientation is not consistent with the Defendant's perception of acceptable gender roles.

56. TerVeer proved himself to be a highly qualified LOC employee before his supervisor learned that he was a homosexual male.

57. Upon learning that TerVeer was a homosexual male, the Defendant subjected him to harsh and discriminatory working conditions and religious lectures.

58. Ultimately, TerVeer was constructively terminated from his position when the LOC refused to take corrective action against his supervisor or to allow his transfer.

59. This disparate treatment was motivated by the fact that TerVeer's status as a homosexual male did not conform to the Defendant's gender stereotypes associated with men under Mech's supervision or at the LOC.

60. Neither sex nor compliance with perceived sexual stereotypes is an occupational qualification for TerVeer's job with the LOC.

61. For the reasons set forth in this Complaint, Defendant's actions violated Title VII of the Civil Rights Act of 1964.

62. Defendant's actions were motivated by malice and reckless disregard for TerVeer's rights under the law.

63. As a result of the Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic damages, emotional distress, and other compensable damages.

**COUNT II**

**(Title VII – Religious Discrimination)**

64. TerVeer is a reconciling Christian, believing in a Christian faith that fully accepts him as a homosexual male and embraces lesbian, gay, bisexual, and transgender (LGBT) persons in all aspects of religious policy and practice.

65. TerVeer proved himself to be a highly qualified LOC employee before his supervisor learned that TerVeer held religious beliefs that could not be reconciled with his fundamentalist religious beliefs that refuse to embrace LGBT individuals in all aspects of religious policy and practice.

66. Upon learning that TerVeer's religious beliefs embraced LGBT individuals, the Defendant subjected him to harsh and discriminatory working conditions and religious

lectures, making it clear that the Defendant did not approve of TerVeer's brand of Christianity.

67. The impact of the religious discrimination perpetrated by Defendant was pervasive and substantial.

68. Ultimately, TerVeer was subjected to a hostile work environment and constructively terminated from his position when the Defendant refused to take corrective action against his supervisor or allow a transfer.

69. For the reasons set forth in this Complaint, Defendant's actions violated Title VII of the Civil Rights Act of 1964.

70. Defendant's actions were motivated by malice and reckless disregard for TerVeer's rights under the law.

71. As a result of the Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic damages, emotional distress, and other compensable damages.

### COUNT III

### (Title VII – Retaliation)

72. TerVeer confronted his supervisor, John Mech, with his belief that Mech was discriminating against him based upon his sexual orientation and religious beliefs.

73. Mech retaliated against TerVeer by accusing him of carrying out a personal attack and asserted that TerVeer was trying to take down the Library.

74. When TerVeer approached Mech's supervisor regarding his complaints, he was ignored.

75. Following the confrontation, TerVeer's work environment worsened. Mech placed TerVeer under higher scrutiny and Mech's communications with him became more hostile.

76. Mech's admitted anger towards TerVeer intensified the hostile work environment.

77. Mech singled out TerVeer for public humiliation amongst his co-workers.

78. Following TerVeer's initiation of a complaint of discrimination, Mech and Christopher blocked TerVeer's access to documents and placed unrealistic restrictions on his ability to develop his administrative action.

79. Christopher began stalking TerVeer and filming him outside of the LOC in an effort to intimidate him.

80. These actions directly show that retaliatory animus played a motivating part in the Defendant's employment decisions.

81. TerVeer confronted Mech and Christopher with a protected opposition to discrimination.

82. The actions taken by the Defendant in response to the protected opposition were materially adverse to TerVeer.

83. There is a causal connection between the protected activity and the materially adverse actions.

84. Ultimately, TerVeer was denied a request to transfer, was subjected to a hostile work environment, and constructively terminated due, at least in part, to retaliation against his protected opposition to discrimination.

85. For the reasons set forth in this Complaint, Defendant's actions violated Title VII of the Civil Rights Act of 1964.

86. Defendant's actions were motivated by malice and reckless disregard for TerVeer's rights under the law.

87. As a result of the Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic damages, emotional distress, and other compensable damages.

**COUNT IV**

**(Fifth Amendment – Due Process)**

88. The Due Process Clause gives substantial protection to adult persons in deciding how to conduct their private lives, including their right to identify as homosexual without government penalty.

89. TerVeer's sexual orientation is unrelated to his ability to perform the duties of a Management Analyst in the Office of Inspector General of the LOC.

90. In subjecting TerVeer to a hostile work environment, refusing his reasonable request for transfer, and constructively terminating his employment without constitutionally sufficient justification, and as otherwise described in this Complaint, Defendant violated rights guaranteed to the TerVeer by the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

91. The actions of the Defendant were motivated by an invidious, irrational fear and prejudice towards homosexuals and/or persons whom do not conform to sex stereotypes recognized by the Defendant.

92. By purposefully and intentionally discriminating against TerVeer because of his identity as a homosexual male without constitutionally sufficient justification, Defendant violated clearly established constitutional rights of due process of which a reasonable person would have known.

93. As a result of the Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic damages, emotional distress, and other compensable damages.

## COUNT V

### (Fifth Amendment – Equal Protection)

### *Pled in the Alternative to Count I*

94. By discriminating against TerVeer because he departs from sex stereotypes by identifying as a homosexual male, Defendant has also engaged in impermissible sex discrimination in violation of the equal protection component of the Fifth Amendment's Due Process Clause.

95. Recognizing that Title VII is the exclusive remedy for a federal employee's claim of employment discrimination, TerVeer pleads in the alternative if he is precluded from bringing a sex discrimination claim under Title VII based upon his status as a homosexual male and/or his deviation from the sex stereotypes recognized by the Defendant.

96. The Defendant has intentionally discriminated against TerVeer because his identity as a homosexual male represents a departure from sex stereotypes recognized by the Defendant, and in doing so acted arbitrarily, irrationally, and without constitutionally sufficient justification.

97. By engaging in arbitrary and irrational discrimination, Defendant violated clearly established constitutional rights of equal protection of which a reasonable person would have known.

98. The actions of the Defendant were motivated by an invidious, irrational fear and prejudice towards homosexuals and/or persons who do not conform to sex stereotypes recognized by the Defendant.

99. As a result of the Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic damages, emotional distress, and other compensable damages.

## COUNT VI

### (Library of Congress Act)

100. Under the Library of Congress Act, Plaintiff TerVeer was entitled to have decisions related to his employment considered "solely with reference to [his] fitness for [the] particular duties" of the Management Analyst position.  2 U.S.C. § 140.

101. The Defendant demonstrated, through its offer of the Management Analyst position, various awards, transfer opportunities, and positive performance reviews that TerVeer was not only fit for the duties of the position but was sought after.

102. TerVeer was terminated from his employment for reasons wholly unrelated to his fitness for the particular duties of the Management Analyst position.

103. For all of the reasons described in this Complaint, the Defendant's actions violated the Library of Congress Act, 2 U.S.C. § 140.

104. As a result of the Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress, and other compensable damages.

## COUNT VII

### (Library of Congress Policies and Regulations)

105. The Library of Congress has a clear policy against harassment based on religious beliefs or sexual orientation. The Librarian has released at least two policy statements, on May 6, 2010 and January 25, 2011, which have emphasized nondiscrimination and prevention of harassment and retaliation on the basis of religious beliefs or sexual orientation.

106. Under the Special Announcements 10-5 and 11-02 of the Library of Congress, Plaintiff was entitled to a work environment free from harassment of any kind, including harassment on the basis of religion or sexual orientation. The Defendant has further violated LOC Regulations, LCR 2010-2, 2023-1, and 2023-2.

107. The actions of the Defendant were motivated by an invidious, irrational fear and prejudice towards homosexuals, and such actions taken as a whole constitute harassment because of TerVeer's religious beliefs and sexual orientation during the course of his employment in the Management Analyst position.

108. For all of the reasons described in this Complaint, the Defendant's actions violated Library of Congress policy, including Special Announcements 10-5, 11-02 and LCR 2010-2, 2023-1, and 2023-2.

109. As a result of the Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress, and other compensable damages.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant, and award the following relief:

    a.   Declaratory relief, including but not limited to a declaration that Defendant's actions violate Title VII, the Fifth Amendment of the U.S. Constitution, the Library of Congress Act, Special Announcements 10-5, 11-02, and LCR 2010-2, 2023-1, and 2023-2;

    b.   Injunctive relief, including but not limited to reinstatement and an order restraining Defendant from engaging in further discriminatory conduct of the types of which Plaintiff complains herein;

    c.   Back pay, in an amount to be determined at trial, which accounts for the Within Grade Increases (WIGI) in salary that the Plaintiff would have been awarded but for the Defendant's discriminatory conduct;

    d.   Front pay, in the event that reinstatement is not granted;

    e.   Compensatory and consequential damages, including for emotional distress;

    f.   Punitive damages;

    g.   Pre-judgment and post-judgment interest, at the highest rate available under the law;

    h.   Attorneys' fees and costs of this action; and

    i.   Any additional relief, as justice allows.

Respectfully submitted,


___/s/_ *Christopher M. Brown*_____
Christopher M. Brown, Esq.
District of Columbia Bar No. 502421
Glen H. Ackerman, Esq.
District of Columbia Bar No. 474793
Ackerman Brown, PLLC
Counsel for Plaintiff
1250 Connecticut Ave., NW, Suite 200
Washington, DC 20036
Tel: 202.393.5428
Fax: 202.355.6489
Chris.Brown@AckermanBrown.com
Glen.Ackerman@AckermanBrown.com


____/s/__ *Thomas J. Simeone*_____
Thomas J. Simeone, Esq.
District of Columbia Bar No. 433425
Simeone & Miller LLP
Counsel for Plaintiff
1130 Connecticut Ave., NW, Suite 350
Washington, DC 20036
Tel: 202.628.3050
Fax: 202.466.1833
TSimeone@SimeoneMiller.com

## JURY DEMAND

Plaintiff demands a trial by jury in this action.

This 3rd day of August 2012.


By Counsels,


___/s/_ _Christopher M. Brown_____
Christopher M. Brown, Esq.
District of Columbia Bar No. 502421
Glen H. Ackerman, Esq.
District of Columbia Bar No. 474793
Ackerman Brown, PLLC
Counsel for Plaintiff
1250 Connecticut Ave., NW, Suite 200
Washington, DC 20036
Tel: 202.393.5428
Fax: 202.355.6489
Chris.Brown@AckermanBrown.com
Glen.Ackerman@AckermanBrown.com


____/s/__ _Thomas J. Simeone_____
Thomas J. Simeone, Esq.
District of Columbia Bar No. 433425
Simeone & Miller LLP
Counsel for Plaintiff
1130 Connecticut Ave., NW, Suite 350
Washington, DC 20036
Tel: 202.628.3050
Fax: 202.466.1833
TSimeone@SimeoneMiller.com