# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**PETER J. TERVEER,**                              )
                                    )      **Civil Action No. 12-1290 (CKK)**
           **Plaintiff,**                     )
                                    )      **ECF**
**v.**                                             )
                                    )
**JAMES H. BILLINGTON, Librarian,**                )
**Library of Congress ,**                          )
                                    )
                **Defendant.**                  )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

COMES NOW Plaintiff, Peter J. TerVeer ("Plaintiff" or "TerVeer"), by and through undersigned counsel, and files this Memorandum of Points and Authorities in Support of his Opposition to Defendant's Motion to Dismiss Plaintiff's Complaint and states the following in support thereof:

## I.  INTRODUCTION

TerVeer hereby opposes Defendant's Motion to Dismiss on the bases that all claims asserted in Plaintiff's Complaint have appropriate jurisdiction before this Court, and that Plaintiff's Complaint alleges sufficient facts to state a proper claim for each cause of action that was asserted therein.  The facts alleged in Plaintiff's Complaint demonstrate all *prima facie* elements of his claims.  Assuming this case survives Defendant's Motion to Dismiss, additional facts are likely be uncovered during discovery, that will strengthen the inferences of discrimination that can be made from the clear pattern and close proximity of discrimination, harassment, and retaliation that Plaintiff articulated in his Complaint.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On February 4, 2008, the Library of Congress ("LOC") hired Plaintiff as a Management Analyst in the Auditing Division of the LOC Office of the Inspector General ("OIG"). Pl. Complaint, ¶1.  Plaintiff was hired as a temporary employee in the OIG. Pl. Complaint, ¶6. Within six weeks, the LOC issued Plaintiff three "On-the-Spot Awards" in recognition of his excellent performance. Pl. Complaint, ¶6.  Due to Plaintiff's performance, the LOC extended Plaintiff's temporary assignment through December 6, 2008. Pl. Complaint, ¶6.  However, months before that date, on October 26, 2008, the LOC hired TerVeer as a full-time employee at the GS-7 level, and by January 30, 2009, LOC placed TerVeer on the LOC career ladder. Pl. Complaint, ¶6.  On March 19, 2009, LOC gave TerVeer his first Within Grade Increase ("WIGI") in salary, and on March 29, 2009, the LOC promoted TerVeer to level GS-9-1. Pl. Complaint, ¶7.

During his employment, TerVeer was supervised by John Mech ("Mech"). Pl. Complaint, ¶1. Mech is a religious man who makes his faith known in the workplace by keeping a Bible on his desk, and interjecting non-secular comments into his written and oral communication. Pl. Complaint, ¶8.  Early on in Plaintiff's career with the LOC, he began to foster a close relationship with Mech and his family. Pl. Complaint, ¶9.  Mech even invited Plaintiff to a University of Maryland football game along with Mech's wife and son. Pl. Complaint, ¶9. Subsequently, in January 2009, Mech facilitated an introduction to his single daughter, Katie Mech, and the two became "friends" on the social networking website Facebook that same month. Pl. Complaint, ¶9.  In August 2009, through public postings on Facebook and subsequent electronic message exchange with Plaintiff, Katie Mech learned that Plaintiff is homosexual. Pl. Complaint, ¶¶10, 11.  When Katie Mech learned of Plaintiff's sexual orientation, she promptly terminated her online Facebook connection with him. Pl. Complaint, ¶11.

Shortly after this occurrence, Mech sent TerVeer an intimidating e-mail that contained photographs of assault weapons and a tagline, "Diversity: Let's Celebrate It;" the e-mail also mentioned Katie Mech. Pl. Complaint, ¶12.  From that point forward, almost every work-related conversation between Mech and Plaintiff began with Mech engaging in a religious lecture in which Mech would impose his conservative Catholic beliefs on Plaintiff. Pl. Complaint, ¶¶12, 14.  In one instance, on June 21, 2010, Mech called Plaintiff to an unscheduled meeting in which, for over an hour, Mech confronted Plaintiff regarding his homosexuality and its non-conformance with Mech's religious beliefs, and proceeded to quote several verses from the Bible to Plaintiff. Pl. Complaint, ¶18.  Mech encouraged TerVeer to repent. Pl. Complaint, ¶18.

Plaintiff's working relationship with Mech changed upon Mech learning Plaintiff's sexual orientation and religious beliefs. Pl. Complaint, ¶13.  Specifically, Mech changed his supervision style from detailed, providing specific instructions, to hands-off, providing ambiguous, unclear instructions. Pl. Complaint, ¶13.  Further, Mech began issuing assignments to Plaintiff that were inappropriate for one individual with his grade level and level of experience to be able to complete in the allotted time. Pl. Complaint, ¶16.  In the Fall of 2009, Plaintiff alone was assigned the ILS Voyager Internal Control Project ("Voyager"), a large, complex project, and his sole instructions came from a brief meeting, whereas the standard OIG procedure entailed a New Project Memorandum detailing the scope of the project, which was never issued. Pl. Complaint, ¶¶15, 16.  A similar project was previously assigned to a team of six individuals and took over a year for the team to complete, and the team had clear objectives and milestones to gauge their progress and performance. Pl. Complaint, ¶16.

In March 2010 the LOC issued Plaintiff another WIGI and promotion to GS-11 based on his 2009 performance. Pl. Complaint, ¶17.  However, Mech began adding additional assignments to

Plaintiff's agenda notwithstanding the fact that he was doing the work of six people with the Voyager project. Pl. Complaint, ¶17.  On May 6, 2010, LOC issued Plaintiff his second "On-the-Spot Award." Pl. Complaint, ¶17.

Throughout this time period, Mech's religious lecturing continued, and Plaintiff discussed the issue with a co-worker, who e-mailed Plaintiff stating "I think [Mech] will stop preaching Jesus to you." Pl. Complaint, ¶19.  Four days after receiving that e-mail, and only six weeks after receiving a promotion and a performance-based award, on June 25, 2010, Mech issued annual performance ratings to Plaintiff that did not accurately reflect the quality of the work he had completed. Pl. Complaint, ¶20.  Accordingly, Plaintiff directly questioned Mech regarding the purpose behind his continuous religious lecturing and unfair treatment since learning that Plaintiff was homosexual. Pl. Complaint, ¶20.  Plaintiff explicitly stated to Mech that he believed his poor review was based upon their divergent religious beliefs. Pl. Complaint, ¶21. Mech became angry with Plaintiff and denied that Plaintiff's homosexuality and religious beliefs had impacted his impartiality to Plaintiff's work and performance. Pl. Complaint, ¶20, 21.  The following day, on June 26, 2010, Mech called Plaintiff into a meeting to "hammer out" the issues of their last conversation, and Mech demanded that Plaintiff sign his performance review, which Plaintiff refused to sign due to its inaccuracies. Pl. Complaint, ¶22.

Two days later, on June 28, 2010, Mech convened a meeting between himself, Plaintiff, and their supervisor, Nicholas Christopher ("Christopher"), to discuss Plaintiff's refusal to sign his performance review; there was no mention of the issues stemming from Mech's personal beliefs regarding religion and homosexuality. Pl. Complaint, ¶23.  Nicholas instructed Plaintiff to do as his supervisor instructed. Pl. Complaint, ¶23.  The next day, on June 29, 2010, Plaintiff informally met with Christopher over a cup of coffee, at which time Plaintiff expressly told

Christopher about Mech's religious lectures, and Plaintiff's belief that he was a victim of discrimination based on sex and religion. Pl. Complaint, ¶24. Plaintiff also informed Christopher that he is homosexual. Pl. Complaint, ¶24. Christopher failed to follow LOC policy by contacting the LOC Office of Opportunity Inclusiveness and Compliance (OIC), and he also failed to advise Plaintiff of the appropriate complaint procedures. Pl. Complaint, ¶25.

From that point forward, Mech continued his harassment of Plaintiff, and he did so under Christopher's supervision. Pl. Complaint, ¶26. Mech continued to create a paper trail of unwarranted, negative performance ratings. Pl. Complaint, ¶¶27, 29. In December 2010, Mech issued an evaluation to Plaintiff regarding Voyager, which violated the standard operating procedure because the project was not yet complete. Pl. Complaint, ¶27. The evaluation was extremely negative in nearly every category. Pl. Complaint, ¶27. Plaintiff again asked Mech if the negative ratings were due to Mech's distaste for Plaintiff's sexual orientation and religious beliefs, and Mech responded by stating that Plaintiff was not to question him, that the office was a dictatorship, and Plaintiff had no rights against his supervisor. Pl. Complaint, ¶27. Mech again demanded that Plaintiff sign the performance review.

Two months later, in February 2011, another negative performance evaluation was issued, again mischaracterizing Plaintiff's work and citing incorrect information. Pl. Complaint, ¶29. Plaintiff again reached out to Christopher stating that he received another inaccurate performance evaluation based on discrimination, and that he was scared of reprisal. Pl. Complaint, ¶30. True to his fear, on March 9, 2011, Mech notified Plaintiff that he was being placed on a 90-day written warning. Pl. Complaint, ¶31.

In early March 2011, Christopher instructed Plaintiff to participate in an Employment Counseling Program, and he was taken to Ms. Susan Diamond's ("Diamond") office for this

counseling. Pl. Complaint, ¶32.  On March 14, 2011, Plaintiff informed Diamond of the extreme stress he was experiencing due to Mech's discrimination, and she immediately referred Plaintiff to Naomi Earp ("Earp"), the Director of OIC. ¶33.  On March 16, 2011, Plaintiff initiated EEO pre-complaint procedures under LCR 2010-3.1, § 4 by engaging in counseling with Earp. Pl. Complaint, ¶34.  Earp telephoned Christopher and informed him of Plaintiff's discrimination allegations, and Christopher informed Earp that he would personally counsel Mech. Pl. Complaint, ¶34.  Also during their telephone call, Earp proposed a solution that she considered to be equitable: Plaintiff should be transferred from OIG to OIC under her supervision, and asked if OIG would approve such a transfer. Pl. Complaint, ¶35.  Christopher responded by declining to accept Earp's proposed solution, stating that Plaintiff was on track to be terminated within six months, so OIG would not approve the transfer. Pl. Complaint, ¶35.  Earp did not consider Christopher's response justifiable.

On June 24, 2011, Mech issued yet another negative performance evaluation, this time denying Plaintiff's WIGI. Pl. Complaint, ¶36.  Mech's evaluation wholly ignored positive feedback that Mech received regarding Plaintiff's performance. Pl. Complaint, ¶36.  Plaintiff informed Christopher that he planned to appeal the WIGI denial, and Christopher relayed that information to Mech, who in response aggressively humiliated Plaintiff in a hostile and abusive interrogation to obtain the facts surrounding Plaintiff's plan to appeal the WIGI denial. Pl. Complaint, ¶37.  On June 30, 2011, Plaintiff submitted to Christopher a Request for Review of Performance Evaluation and Denial of WIGI. Pl. Complaint, ¶38.  Christopher refused to change the evaluation, and also denied the WIGI. Pl. Complaint, ¶38.

Plaintiff sought medical assistance and counseling due to the stress of his hostile work environment and was advised by his medical professionals to take medical leave from work. ¶39.

Accordingly, from August 19, 2011 through September 23, 2011, Plaintiff used paid sick leave. On September 28, 2011, Plaintiff filed an Allegation of Discrimination, with the Equal Employment Opportunity Complaints Office ("EEOCO"); this constitutes the LOC's informal complaint process. Pl. Complaint, ¶40.   In Plaintiff's informal complaint, he alleged discrimination based on sex, hostile work environment, and reprisal. Ex. 1, Allegation of Discrimination. On October 25, 2011, Vicki Magnus ("Magnus"), Special Assistant of the OIC, issued a memorandum to Plaintiff, that specified his right to file a formal complaint within ten business days of receipt of the memorandum.   Ex. 2, Memorandum Noticing Right to File Formal Complaint. Within ten business days, on November 7, 2011, Plaintiff filed his formal complaint with the EEOCO, alleging discrimination based on sex and religion, harassment/hostile work environment, and retaliation. Pl. Complaint, ¶47; Ex. 3, Plaintiff's Formal EEOCO Complaint.   On December 16, 2011, Magnus issued a Notice of Receipt and Acceptance of Formal Complaint of Discrimination, acknowledging that Plaintiff filed a complaint alleging discrimination based on religion, sex, sexual harassment, hostile work environment, and reprisal. Ex. 4 Notice of Receipt and Acceptance of Formal Complaint of Discrimination.

However, between the time that Plaintiff filed his informal and formal EEOCO complaints, additional discriminatory conduct and harassment occurred, including Christopher demanding that Plaintiff request permission to use his workday to pursue his administrative EEOCO action. Pl. Complaint, ¶¶41, 42.  Christopher even followed Plaintiff and filmed him while he was off-duty and off LOC premises in order to frighten and humiliate him. Pl. Complaint, ¶43.   On October 12, 2011, due to continued stress from Christopher and Mech, Plaintiff took additional leave under the Family Medical Leave Act ("FMLA") to continue medical treatment. Pl.

Complaint, ¶44.  The LOC failed to timely provide Plaintiff with the proper FMLA paperwork, and while the LOC ultimately did approve his time off, it did so after a humiliating, unnecessary formal inquiry into his actions, including erroneous allegations of being absent without leave ("AWOL"). Pl. Complaint, ¶45.  The inquiry also included out-of-line questions regarding why Plaintiff failed to inform his harassing supervisor directly of his intention to work on his discrimination complaint during work hours. Pl. Complaint, ¶46.

Plaintiff's FMLA leave ended on or about January 3, 2012, and shortly thereafter, Christopher sent Plaintiff a letter declaring him AWOL, directing him to return to duty regardless of any health-related issues that he was experiencing, and that no additional requests for leave without pay ("LWOP") would be considered. Pl. Complaint, ¶48.  Plaintiff responded to Christopher by stating that he would follow up with his doctors about returning to work. Pl. Complaint, ¶49.  On March 29, 2012, LOC Inspector General Karl Schornagel ("Schornagel") issued Plaintiff a letter, stating that Plaintiff was considered AWOL, and that he would be terminated on April 6, 2012 if he did not return to work. Pl. Complaint, ¶41; Ex. 5, Letter from Schornagel.  Plaintiff received the letter on or about April 1. After consulting with his doctors, on or about April 4, 2012, Plaintiff concluded that he could not return to work, and on that date he was constructively discharged.  Accordingly, on April 5, 2012, Plaintiff filed an appeal of adverse action, which the LOC stayed on August 6, 2012. Pl. Complaint, ¶52.

On May 8, 2012, the LOC issued its final agency decision denying Plaintiff's claims of discrimination, and stated that Plaintiff could file a complaint in federal court within ninety days. Pl. Complaint, ¶53; Ex. 6, LOC Final Agency Decision.  Within the ninety days, on August 3, 2012, Plaintiff commenced this action by filing his Complaint.

## III.  LEGAL STANDARD

### A.  Lack of Subject Matter Jurisdiction

On a motion to dismiss brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of establishing that the court has subject matter jurisdiction. *Dist. of Columbia Ret. Bd. v. United States*, 657 F. Supp. 428, 431 (D.D.C. 1987).   In considering a motion to dismiss for lack of subject matter jurisdiction, the Court must "accept as true all of the factual allegations contained in the complaint." *Atherton v. Dist. of Columbia*, 567 F.3d 672, 681 (D.C. Cir. 2009).

### B.  Failure to State A Claim

When presented with a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the Court will only dismiss the claim if the plaintiff fails to plead "enough facts to state a claim for relief that is plausible on its face." *Bailey v. Verizon Commc'ns., Inc.*, 544 F. Supp.2d 33, 36 (2008) (*citing Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).   The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (*citing Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiff's "short plain statement of the claim" must contain a minimal level of factual detail, although that level is indeed very minimal. *See Bell Atlantic*, 550 U.S. at 555 & n.3 (2007).

The Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged. *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (*citing Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).   On a Rule 12(b)(6) motion, courts are

to presume the truth of all factual allegations in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Further, on a 12(b)(6) motion, it is also proper to consider documents of which courts may take judicial notice, such as government documents and other public records. *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997).

### C.  Defendant's Exhibit "F" Must be Disregarded

Defendant attached as Exhibit "F" to its Motion to Dismiss, a letter dated August 6, 2012 from Evelio Rubiella to Plaintiff's counsel, Christopher Brown, regarding the LOC's decision to stay Plaintiff's appeal of his termination.  While Plaintiff has addressed the import of this document *infra,* the Court must disregard this letter and not consider it in its ruling on the Motion to Dismiss.

Defendant cites to *Ward v. D.C. Department of Youth Rehabilitation Services,* 768 F.Supp.2d 117 (D.D.C. 2011) for the proposition that "[t]he Court may consider its attached exhibits in deciding the motion to dismiss because each document is either incorporated by reference in the Complaint, or is a Library of Congress regulation."  Motion to Dismiss, page 1.  Exhibit "F" however, is neither incorporated by reference in the Complaint nor a LOC regulation.  Further, a letter penned by the LOC, after the date of filing of the Complaint, *per se* falls outside of the documents that can be considered in a motion to dismiss without converting the motion into a motion for summary judgment that must be disposed of in accordance with FED. R. CIV. P. 56.

"In deciding a motion brought under Rule 12 (b)(6), a court does not consider matters outside the pleadings, but a court may consider on a motion to dismiss the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss. *Ward v. D.C. Dep't of Youth Serv's,* 768 F.Supp.2d 117, 119. (internal quotations and citations

omitted).  Because the letter post-dated the filing of the Complaint, it is impossible for it to be attached as an exhibit or incorporated by reference.  Exhibit "F" is not a government document, regulation or public record.

The normal course of action when materials outside the complaint are considered is for a nominal motion to dismiss to be treated as a motion for summary judgment.  *Tele-Comm. Of Key West, Inc. v. United States,* 757 F.2d 1330, 1334 (D.C. Cir. 1985).  Rule 12(b) provides that, if a motion to dismiss is converted to a motion for summary judgment, "all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56. *Id.* Under Rule 56 such materials include affidavits and documentary evidence that would show that a genuine issue of material fact existed. *Id.*

The problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff at the time he frames his complaint.  *Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir. 1991).  Where the non-moving party had actual notice at the time he framed his complaint, the need to transform a motion to dismiss to a motion for summary judgment largely dissipates. *Id.*  But here such notice is impossible since the Complaint was already filed when Exhibit "F" was created.  It must be disregarded.

## IV.  ARGUMENT

### A.  Plaintiff's Claim For Constructive Termination Was Pled Sufficiently To Survive A Motion To Dismiss

Plaintiff has pled sufficient facts in his Complaint to demonstrate that he was constructively terminated from his employment at the LOC.  Further, Plaintiff can demonstrate that his claim of constructive termination has grown out of the charges that he filed with the LOC's internal EEOCO, such that it is appropriate for the Court to allow this claim to remain in this Court pursuant to the theory of ancillary jurisdiction.

1. **Plaintiff Pled Sufficient Facts To Demonstrate That His Failure To Return To Work Constituted A Resignation Which Effectively Acted As A Constructive Termination[1]**

A *prima facie* claim of constructive discharge requires a showing that: 1) the employer intentionally discriminated against him; 2) the employer deliberately made his working conditions intolerable; and 3) aggravating factors justified the claimant's conclusion that he had no options but to end his employment. *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008); *Carter v. George Washington Univ.*, 180 F. Supp.2d 97, 110 (D.D.C. 2001); *Bron v. D.C.*, 768 F. Supp.2d 94 (D.D.C. 2011).

Plaintiff's Complaint sufficiently pleads each element of a constructive discharge claim. In support of the first element, Plaintiff stated that his supervisor's, Mech, attitude towards him became hostile after learning that Plaintiff is homosexual. Thereafter, Mech began a series of instances of verbal and electronic harassment, in which he imposed his sex stereotypes and fundamental religious beliefs on homosexuality upon Plaintiff. Pl. Complaint, ¶1. Plaintiff further alleged that Mech's supervision style changed after learning of Plaintiff's sexual orientation and differing religious opinions. Pl. Complaint, ¶¶12, 13. Specifically, while his instructions were formerly detailed and specific, once Mech learned of Plaintiff's sexual orientation and religious beliefs, his supervision became "hands-off" and his instructions were ambiguous and unclear. Pl. Complaint, ¶13. Plaintiff has therefore alleged sufficient facts to demonstrate that Mech intentionally discriminated against him because of his sex and religious beliefs. *See also* Pl. Complaint, ¶¶ 57, 66, 72.

---

[1] While Plaintiff asserted several times throughout his Complaint he was constructively terminated, ¶ 54, 58, 68, 84, 90, he acknowledges that he did fail to formally assert his constructive termination claim as a count. Accordingly, Plaintiff moves for leave to amend his Complaint to clarify that his constructive termination is in fact a separate cause of action that he has pled.

Plaintiff has also satisfied the second element of his constructive discharge claim by averring statements that demonstrate his superiors deliberately made his working conditions intolerable. Plaintiff stated in his Complaint that, on June 21, 2010, Mech engaged in escalating "religious diatribes," Pl. Complaint, ¶14, and that Mech even called an unscheduled meeting that lasted over an hour for the purpose of educating Plaintiff "on Hell and that it is a sin to be a homosexual…[that] homosexuality was wrong [,] and that [TerVeer] would be going to Hell." Pl. Complaint, ¶18. Plaintiff went into further detail in his Complaint with regard to this unscheduled meeting, stating that "Mech began reciting Bible verses to TerVeer in support of his lecture, telling TerVeer, 'I hope you repent because the Bible is very clear about what God does to homosexuals.'" Pl. Complaint, ¶18.

Plaintiff's Complaint even specifies sections of the Bible that Mech preached to Plaintiff in that meeting. Pl. Complaint, ¶18. Plaintiff's Complaint also details a subsequent meeting between himself and Mech in which he addressed Mech's "purpose in his continuous religious lecturing and unfair treatment that began after Mech learned TerVeer was homosexual." Pl. Complaint, ¶20. Specifically, Plaintiff alleged that he told Mech "that he believed his poor rating was based upon their divergent religious beliefs." Pl. Complaint ¶21. Plaintiff's Complaint also asserted that he expressly informed his second-tier supervisor, Christopher, at the same time. Pl. Complaint, ¶¶21, 24.

Plaintiff also details specific instances that demonstrate that he was working under intolerable conditions from two levels of supervisors, Mech and Christopher, who ultimately ensured that Plaintiff could not be successful in completing his job duties due to their harassing conduct. Plaintiff discusses how he was unable to complete satisfactory work because he was purposefully assigned projects that were too large for someone at his GS level to complete alone

in the amount of time provided to complete the assignment. Pl. Complaint, ¶¶15, 16.  Plaintiff further asserted that "Mech began piling on more work to ensure that TerVeer's performance would falter." Pl. Complaint, ¶17.  Plaintiff also stated that he was given low ratings and denied his WIGI, notwithstanding the fact that he had received positive feedback, which was ignored completely in the evaluation. Pl. Complaint, ¶36.

Lastly, Plaintiff alleged sufficient facts to support the third element of a constructive termination claim.  Plaintiff stated in his Complaint "the stress of TerVeer's hostile work environment took its toll on TerVeer both mentally and physically.  TerVeer required medical assistance and counseling as a direct result of his work environment." Pl. Complaint, ¶39. Plaintiff further alleges that following his paid sick leave he was criticized and penalized at work for taking such time off. Pl. Complaint, ¶¶39, 41.  Plaintiff went on to state that "the work environment became too hostile… to continue working under Mech and Christopher's supervision, and his requests for transfer were denied.  TerVeer was constructively terminated on April 6, 2012[2] *because he was unable to return to a workplace where he had to confront constant discriminatory treatment* from Mech and Christopher." Pl. Complaint, ¶54 (emphasis added).

The above cited statements from Plaintiff's Complaint, when assumed true and viewed in the light most favorable to the Plaintiff as required under Rule 12(b)(1) and 12(b)(6), demonstrate: Plaintiff was intentionally discriminated against, his employer deliberately made his working conditions intolerable, and that aggravating factors of continued harassment and discrimination justified Plaintiff's conclusion that he had no option but to end his employment by

---

[2] While Plaintiff stated in his Complaint that he was constructively terminated on April 6, 2012, this was an error. Plaintiff hereby moves to correct the record by stating that April 4, 2012 was the date that he was constructively discharged.

not returning to work.  Accordingly, Plaintiff has pled sufficient facts to demonstrate that he was constructively discharged on April 4, 2012.

### 2. This Court has Jurisdiction Over Plaintiff's Constructive Termination Claim Because of the Nature of Plaintiff's Claim and Because Plaintiff Followed the Required Administrative Procedures

#### a. Plaintiff Met The Procedural and Administrative Requirements For His Constructive Termination Claim

There is an abundance of law in this jurisdiction that discusses the administrative exhaustion requirement for Title VII claims.  "The claims that a plaintiff may assert in a Title VII lawsuit are limited by the requirement of exhaustion of administrative remedies.  Before filing a Title VII suit in federal court, a plaintiff must file an administrative complaint with the agency being charged with the violation. *See* 42 U.S.C. § 2000e–16(c), *Christopher v. Billington*, 43 F.Supp.2d 39, 47 (D.D.C. 1999) (authorizing the commencement of a civil action after the receipt of a notice of final action by an agency).  If the plaintiff subsequently files a lawsuit, his claims are restricted to only those claims asserted in his administrative complaint as well as those that are "'like or reasonably related to the allegations of the charge and [which grow] out of such allegations.'" *Park v. Howard Univ.,* 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting *Cheek v. Western and Southern Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir. 1994)).  "Any other theories are barred *unless the claim is 'like or reasonably related to the allegations of the administrative EEO complaint and growing out of such allegations*.'" *Ponce v. Billington*, 652 F.Supp.2d 71, 74 (D.D.C. 2009) (emphasis added).  "By requiring exhaustion before the agency in the first instance, Congress did not intend to 'erect a massive procedural roadblock to access the courts.'…Rather, the exhaustion requirement is intended to give the agency the opportunity to right any wrong it may have committed." *McRae v. Librarian of Congress*, 843 F.2d 1494, 1496 (D.C. Cir. 1988) (citing *President v. Vance*, 627 F.2d 353, 362 (D.C. Cir. 1980)).  "Fairness, not

excessive technicality, is the guiding principle under both Title VII, and the Federal Rules of Civil Procedure." *Gordon v. Nat'l Youth Work Alliance,* 675 F.2d 356, 361 (D.C. Cir. 1982) (*accord Zipes v. Trans. World Airlines*, 455 U.S. 385, 396 (1982); *Love v. Pullman*, 404 U.S. 522, 527 (1972).

As previously set forth, Plaintiff followed all appropriate administrative procedures with regard to his discrimination claims.[3] *See supra* 1-8.  At the time that Plaintiff filed both his informal complaint, and his formal complaint with the LOC EEOCO (September 28, 2011and November 9, 2011 respectively), he had not yet been terminated - constructively or otherwise.  It logically follows that Plaintiff would not – nor could he have - asserted that he was being wrongfully terminated by constructive discharge.  At the time that he filed his informal and formal complaints, Plaintiff had endured discrimination based on sex and religion, sexual harassment, a hostile work environment based on sex and was the victim of retaliation - all of which were discussed in his EEOCO complaints.  While Plaintiff acknowledges that he could have amended his early complaints to include his later constructive termination, such action was not his sole administrative remedy, and instead he chose an alternative administrative remedy.

Plaintiff was constructively discharged on April 4, 2012, when he came to the conclusion that he had no option but to resign because he could not return to work under the same discriminatory and harassing condition in which he took leave.  Plaintiff was forced to this conclusion after having received a March 29, 2012 letter stating that the LOC intended to terminate him on April 6, 2012 if he did not return to work. Pl. Complaint, ¶51.

---

[3] Defendant has not argued that Plaintiff failed exhaust administrative procedures with regard to his discrimination claims. Defendant solely argued that Plaintiff failed to exhaust administrative procedures with regard to his claims of constructive termination and failure to transfer. Def.'s Motion, p. 8-13. Plaintiff, however, has not pled a claim for failure to transfer.

On April 5, 2012, knowing that he could not return to work and that his resignation acted as a constructive termination, Plaintiff filed an Appeal of Adverse Action ("Appeal"). Pl. Complaint, ¶52. In the four months following the filing of the Appeal, the only action that the LOC had taken was to work with Plaintiff's counsel to strike hearing officer candidates in an effort to select an officer. This process was complete on April 23, 2012. The LOC took no further action. On August 3, 2012, Plaintiff commenced this litigation, and subsequently, on August 6, 2012, the LOC stayed Plaintiff's Appeal, citing the filing of this litigation as the cause.

While no final decision has been rendered by the LOC on his Appeal, Plaintiff did in fact exhaust the procedural remedies available to him through the LOC. Specifically, by filing his Appeal, Plaintiff gave the LOC the opportunity "to right any wrong it may have committed," which is the purpose of the exhaustion requirement. *McRae v. Librarian of Congress*, 843 F.2d 1494, 1496 (D.C. Cir. 1988) (citing *President v. Vance*, 627 F.2d 353, 362 (D.C. Cir.1980)). Instead of attempting to right its wrong, the LOC is attempting to procedurally roadblock Plaintiff by staying his Appeal and procedurally prolonging the conclusion of his administrative matter. Since Plaintiff's claim is reasonably related to, and grows out of, the allegations in his EEOCO charge, this Court has jurisdiction over Plaintiff's claim of constructive termination.

Plaintiff's EEOCO charge states the aforementioned bases of his discrimination, and that it is the OIG that has discriminated against him. Plaintiff's charge provides a thorough and detailed statement and timeline of the discriminatory conduct that the supervisors of OIG engaged in. The charge discusses intentional discriminatory conduct by the OIG against Plaintiff, which is the first element of a *prima facie* showing for a claim of constructive discharge. The charge also discusses the OIG's deliberate, severe, and pervasive harassment that created intolerable working conditions for the Plaintiff. Specifically, the same facts that support the

second element of Plaintiff's *prima facie* showing of a constructive discharge claim are the same facts that support his claims of sexual harassment and hostile work environment. The facts listed in Plaintiff's EEOCO charge are the facts that ultimately led to Plaintiff's constructive termination. The only element of Plaintiff's constructive termination claim that is not shown in his EEOCO charge is the third element, that the aggravating factors justified his conclusion that he had no option but to end his employment; however, these aggravating factors are reasonably related to the preceding allegations that were the subject of the charge and are related to the Appeal that Plaintiff filed four months before commencing this lawsuit.

Therefore, because Plaintiff's claim in the instant action is reasonably related to, and grows out of, the allegations contained in his EEOCO charge, and Plaintiff has exhausted the required administrative procedures, the Court has jurisdiction over Plaintiff's claim of constructive termination.

### b. Ancillary Jurisdiction Is Appropriate Over Plaintiff's Constructive Discharge Claim

Should the court find that Plaintiff's filing of his Appeal, and the LOC's subsequent staying the Appeal, thereby preventing a final decision, is insufficient to be considered exhaustion of the administrative process for his constructive termination claim, Plaintiff urges this Court to employ the ancillary jurisdiction doctrine to review Plaintiff's claim of constructive discharge.

"The precepts of the ancillary jurisdiction doctrine dictate that the federal courts should extend their jurisdiction to encompass orbital disputes subordinate to the principal action." *Morrow v. D.C.*, 417 F.2d 728, 740 (D.C. Cir. 1969) (citing *State of Iowa v. Union Asphalt & Roadoils, Inc.*, 281 F.Supp. 391, 396 (S.D. Iowa 1969). Ancillary claims that grow out of the original charge may be proper before the federal court where the charge was only filed for the

initial claim. *Kizas v. Webster*, 707 F.2d 524, n.102 (D.C. Cir. 1983) (citing *Gupta v. East Tex. State Univ,* 654 F.2d 411, 414 (5th Cir. 1981). "Once federal jurisdiction properly attaches to a primary case, the court also has jurisdiction over certain subsidiary or subordinate disputes even though it might not independently be able to proceed to adjudicate them." *Morrow v. D.C.*, 417 F.2d 728, 740 (D.C. Cir. 1969). "The major purpose of ancillary jurisdiction…is to [e]nsure that a judgment of a court [ ] gain[s] full effect…This purpose is joined by another,…that of judicial economy; disputes related to a single dispute should be resolved in the original forum." *Id.*

"To effectuate these purposes, and yet confine a court to proper bounds consistent with the past use of ancillary jurisdiction [ … ] ancillary jurisdiction should attach where: (1) the ancillary matter arises from the same transaction which was the basis of the main proceeding, or arises during the course of the main matter, or is an integral part of the main matter; (2) the ancillary matter can be determined without a substantial new fact-finding proceeding; (3) determination of the ancillary matter through an ancillary order would not deprive a party of a substantial procedural or substantive right; and (4) the ancillary matter must be settled to protect the integrity[4] of the main proceeding or to insure that the disposition in the main proceeding will not be frustrated." *Morrow v. D.C.*, 417 F.2d 728, 740 (D.C. Cir. 1969). Plaintiff's constructive termination claim meets each element of this test.

As discussed above, Plaintiff's claim of constructive termination arises out of the same set of transactions that are the bases of the main proceeding. *supra* 9-15. Plaintiff's constructive termination claim relies on many of the same facts and deliberate discriminatory conduct listed within Plaintiff's EEOCO charge. Specifically, Plaintiff's EEOCO charge, alleging discrimination, sexual harassment, hostile work environment, and retaliation, sets forth facts and

---

[4] Integrity is defined as "the quality or state of being complete or undivided." "Integrity," *Merriam-Webster.com*. 2013. http://www.merriam-webster.com/dictionary/integrity (17 Feb. 2013).

circumstances that ultimately led to Plaintiff's constructive termination.  While there are some additional facts that arose after his initial EEOCO charge was filed, the majority of the facts can be determined without a substantial new fact-finding proceeding.  The same discovery that Plaintiff will engage in for his discrimination, harassment, and retaliation claims will likely produce the evidence that will prove his constructive termination claim.

If this Court allows Plaintiff's constructive termination claim to proceed through its exercise of ancillary jurisdiction, a subsequent determination by this Court would not deprive either party of a substantial procedural or substantive right.  Defendant stayed Plaintiff's Appeal upon service of this lawsuit, and has failed to act in a manner that would provide Plaintiff with an administrative remedy.  Accordingly, Plaintiff would benefit by having this Court decide his constructive termination charge, as this Court will afford him a more expeditious process.  Further there are no substantive rights that Plaintiff is relinquishing by having his constructive termination decided in this forum.  In fact, this Court is the forum that would review Plaintiff's Appeal if he were not satisfied with the LOC's ultimate decision.  In addition, Defendant has failed to assert any harm it would suffer by having this Court hear Plaintiff's constructive termination claim at this time.  Accordingly, Defendant would not be harmed procedurally or substantively if Plaintiff's constructive termination claim were to be heard in this forum.

Lastly, the issue of Plaintiff's constructive termination must be decided to protect the integrity of Plaintiff's other claims.  The causes of action asserted by Plaintiff in his Complaint, including his constructive termination claim, share common facts.  To separate Plaintiff's claims would chip away at the integrity of each individual claim as the facts and causes of action are heavily intertwined.

Ancillary jurisdiction has been employed by federal courts to provide a jurisdictional basis for retaliation claims where such claim arose out of the same set of facts as the plaintiff's initial charge with the EEOC. It was immaterial that plaintiff failed to file an additional EEOC charge for the retaliation.  In *Gupta v. East Tex. State Univ.*, the plaintiff filed an EEOC charge complaining of discrimination based on religion and national origin, and later filed a complaint in federal court alleging discrimination based on religion, national origin, *and* retaliation. *Gupta v. East Tex. State Univ.*, 654 F.2d 411 (5th Cir. 1981).  The court held that the plaintiff could assert a civil action on the retaliation claim, an ancillary claim not filed with the EEOC, because it grew out of the original charge. *Id.*, at 414.

An analogy can be drawn between the instant case and the circumstances in *Gupta*. In the instant action and in *Gupta*, both filed an initial EEO charge asserting allegations of discrimination.  Additionally, both filed a civil action in federal court alleging the claims listed in the initial EEO charge, as well as an additional claim that arose from additional instances of the same type of discriminatory conduct after the charge had been filed.  In each case, the additional instances were wholly related to the same facts listed in the original EEO charge.

It is also in the Court's interest to have Plaintiff's constructive termination claim heard in this forum to maximize judicial economy.  If the Court does not allow Plaintiff's constructive termination claim to remain pursuant to the theory of ancillary jurisdiction, it is only a matter of time before the Plaintiff brings this cause of action again. Specifically, when the LOC lifts the stay and there is a final determination.  At that time Plaintiff will have exhausted his administrative remedies and he will be able to file a complaint in this Court for his constructive termination claim. LOC § 2020-4(E)(6).

Therefore, ancillary jurisdiction is appropriate because Plaintiff's constructive discharge claim arises from the same set of facts as his remaining claims, a new fact-finding proceeding would not be necessary, neither party would be deprived of a substantive or procedural right, the constructive discharge claim must be settled to protect the integrity of Plaintiff's other claims, and it satisfies the interest of judicial economy.

### 3. Statements Included In Plaintiff's Complaint Are Part Of The EEOCO Record Of Investigation And Are Not Confidential

The facts alleged in Plaintiff's Complaint are, on a motion to dismiss, to be assumed as true and held in the light most favorable to the Plaintiff. Argument by Defendant regarding whether the statement surrounding Christopher's refusal to allow TerVeer's transfer to OIC are admissible, is not an appropriate argument for this stage of the litigation. While Plaintiff concedes that it may be an appropriate argument on a motion for summary judgment, the argument will still fail.[5]

While the LOC's EEO guidelines state that EEO counselors shall seek a resolution on as informal and confidential basis *as possible*, it does not stand to preclude the statements at issue from being asserted in a civil action or admitted by the Court. LCR 2010-3.1, § 3E.

While the EEO Counselor has a duty to offer a solution that she considers equitable. LCR 2010-3.1, § 4(D), they are not necessarily cloaked in secrecy. Because, "where either the complainant or management *refuses to accept the proposed solution*, *offering no reason that the Counselor considers justifiable*, *the Counselor has a duty to make a record of this in her report*. Where such refusal was by management, the reason for the refusal shall be stated in writing; the Assistant Chief may then take the matter and the pertinent files directly to the Chief for a decision on implementing appropriate corrective action immediately." LCR 2010-3.1, § 4(D).

---

[5] Defendant appears to believe that Plaintiff was attempting to state a separate claim for Failure to Transfer. This is not the case.

Accordingly, there should be two business records from the LOC EEOCO stating management's refusal to accept Earp's proposed solution: in Earp's ROI and management's written statement citing the reason for its refusal to accept Earp's solution.

None of the cases cited by Defendant are applicable to the instant case, because none of the them involve the LOC.  As such, the LOC regulations are not applicable as they are here.  As discussed below, each of the cases are factually or procedurally distinguishable from the instant case such that they are inapplicable.

In *Olitsky v. Spencer Gifts, Inc*, the Court held that an EEOC Counselor's informal notes that were taken while she had a conversation with the defendant's in-house counsel were inadmissible under 706(b) of Title VII for the purpose of admitting a party admission. *Olitzky v. Spencer Gifts, Inc*., 842 F.2d 123, 126 (5th Cir. 1988).  Specifically, the defendant's counsel admitted to the EEOC agent during mediation that he was unable to rebut certain evidence of age discrimination.  *Id.*  The plaintiff later sought to admit the statement as a party admission. *Id*. The court specified that, "nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without written consent of the persons concerned." *Id*.

*Olitsky* is procedurally and factually distinguishable from the instant case. First and foremost, *Olitsky* was a private sector employment discrimination case, where the instant case is public sector employment.   Not only do theTitle VII regulations that apply but the LOC regulations do as well.  Plaintiff and the LOC were not in mediation as were the parties in *Olitsky*.  Since LOC regulations state that where an informal resolution is proposed and subsequently rejected for a reason that the Counselor does not consider justified, the Counselor has a duty to make a written record of the rejection.  The LOC regulations mandate that rejection

of the proposed resolution become part of the ROI, which a plaintiff has a right to make public during the course of litigation.  The facts and circumstances are clearly distinguishable, *Olitsky* should not apply.

Defendant cites a rule from *Mertz v. Marsh*, that the pre-complaint process is informal and the identities of aggrieved persons are confidential. *Mertz v. Marsh,* 786 F.2d 1578, 1580-81 (11th Cir. 1986).  However, this argument is inapplicable because neither party in the instant case is complaining that the Plaintiff's identity be kept confidential.  Rather, the Defendant is attempting to argue that statements made by its agents should be kept confidential with regard to its refusal to accommodate the Plaintiff.  The rule stated in *Mertz* is clearly not applicable to the instant case.

The Defendant's reliance on *Dura v. Dalton* is not persuasive because the facts therein are distinguishable from this case.  In *Dura*, the Defendant made negative statements about Plaintiff's character and integrity in an article printed in an agency newsletter, which formed the basis of Plaintiff's initial grievance.  During an informal resolution meeting, the agency official made similar remarks about Plaintiff's character, which the Plaintiff wanted to be admitted during litigation. *Id*.  The court held that "settlement negotiations, including any statements and proposals, are to be treated as confidential and privileged to facilitate a candid interchange to settle disputes informally." *Id*. (citing *Harris v. Dalton,* 1994 WL 746376, at *2 (Mar. 23, 1995)).  In the instant case, however, the parties were not in settlement talks, and certainly there was no requirement that such statements be made part of the formal record of investigation as is required under the LOC regulations.  Accordingly, the facts and procedure of *Dura* are too distinguishable for the same rules to apply here.

Defendant also relies on *Nelson v. Henderson* for its proposition, that the EEO counseling process is confidential. *Nelson v. Henderson*, 1999 WL 111831, at *n.3 (Feb. 24, 1999). This case is also distinguishable and inapplicable. The Plaintiff in *Nelson* asserted that he was retaliated against because his supervisors had access to his informal complaint. The court concluded that was not so because the counseling process requires confidentiality *Id*. In *Nelson* there was no requirement that offers of resolution be made a part of the formal record, making it factually and procedurally dissimilar to the instant case such that the rules cited therein should not be applied here either.

As Plaintiff has alleged in his Complaint, he met with EEO Counselor Earp, who proposed as a resolution to Christopher during an informal phone call, that TerVeer be transferred from OIG to her supervision in OIC. She sought his approval of the transfer. Pl. Complaint, ¶¶ 34, 35. Plaintiff was not engaged in mediation at that time, nor did Earp make any notes that Plaintiff is trying to divulge. To the contrary, Earp should have made a formal record of the refusal to transfer pursuant to the LOC regulations. LCR 2010-3.1, § 4(D).

Therefore, the facts asserted in Plaintiff's Complaint are admissible statements pursuant to the LCR 2010-3.1, § 4(D) and Federal Rule of Evidence 803(6)(B).

**B. Plaintiff Pled Sufficient Facts To Sustain Discrimination Claims Under Title VII**

### 1. Sex Discrimination

#### a. Plaintiff has Alleged a Viable *Prima Facie* Case of Discrimination Because of Sex Under Title VII

Defendant asserts a single bases for dismissal of Plaintiff's sex discrimination claim: TerVeer's alleged failure to set forth specific allegations regarding the particular ways in which he failed to conform to sex stereotypes in the workplace, such as behavior, demeanor or appearance. Def.'s Motion p. 16. But Plaintiff's Complaint is not limited to, nor does it solely

rely upon sex stereotyping to demonstrate the LOC discriminated against TerVeer based upon his sex.  The Plaintiff brings his claim pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* to remedy *sex stereotyping, gender discrimination,* religious discrimination, and retaliation in employment. Pl. Complaint, ¶2. (emphasis added).   The Complaint is replete with allegations that support the many ways that the Defendant actually relied upon TerVeer's gender in making its adverse employment decision.

Evidence of gender stereotyping is simply one means of proving sex discrimination. *Macy v. Dep't of Justice,* EEOC Appeal No. 0120120821 (Apr. 20, 2012); 2012 WL 1435995. (internal citations omitted).[6]  Title VII prohibits discrimination based on sex whether motivated by hostility, by a desire to protect people of a certain gender, by assumptions that disadvantage men, by gender stereotypes, or by the desire to accommodate other people's prejudices or discomfort.  *Id.* (internal citations omitted).  As noted in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989) and addressed at length *infra.*, the central question is always whether the "employer actually relied on [the employee's] gender in making its decision.  *Id.,* at 251.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(a) requires [a]ll personnel actions affecting employees … [of] the Library of Congress shall be made free from any discrimination based on … sex. 42 U.S.C. § 2000e-16(a).  To establish a *prima facia* case of employment discrimination pursuant to Title VII, the Plaintiff must show that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position in question; and (4) he was treated differently from similarly situated individuals outside of his protected class.  *Smith v. City of Salem,* 378 F.3d 566, 570 (6th Cir. 2004).

---

[6] Although the courts are not bound by the EEOC's interpretation of Title VII, it is nevertheless appropriate to consider the EEOC's interpretation because of the EEOC's charge to enforce the Act. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986).

With regard to the first element, TerVeer is a member of a protected category. Title VII's prohibition of discrimination "because of … sex," as a protected category, protects men as well as women. *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.,* 462 U.S. 669, 682 (1983). Here, Plaintiff's Complaint asserts that TerVeer is a homosexual male, and as a male, he falls within this protected category. Pl. Complaint, ¶55.

TerVeer also meets the second element of a Title VII claim of discrimination since he suffered adverse employment actions during his employment with the LOC. "[A]n adverse employment action must involve a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Kumar v. D.C. Water & Sewer Auth.*, 25 A.3d 9, 17 (D.C. 2011). Specifically, TerVeer suffered adverse employment actions when he was denied promotions denied a WIGI, and was constructively terminated. Pl. Complaint, ¶¶1, 16, 39, 57, 58. Accordingly, consistent with *Kumar*, the LOC's denial of TerVeer's promotions, WIGI and his constructive termination all qualify as adverse actions. In addition, the hostile work environment that TerVeer was subjected to also qualifies as an adverse employment action because part of the severe and pervasive hostile behavior suffered by TerVeer includes the LOC assigning TerVeer significantly different responsibilities. Specifically, TerVeer was required to perform work that should have been assigned to several people, as opposed to one person, and those people would have likely had a higher GS-level. *supra,* Pl. Complaint, ¶¶ 16, 17. Therefore, TerVeer was also subject to the adverse employment action of enduring a hostile work environment.

TerVeer meets the third element of a discrimination claim because he was qualified for his job. Pl. Complaint, ¶¶1, 7, 56. TerVeer was hired as a GS-7, and he received promotions,

WIGIs, and awards, due to his performance Pl. Complaint, ¶¶1, 6, 7, 17.  At the time that TerVeer was terminated, the LOC had promoted TerVeer to a GS-11. Pl. Complaint, ¶¶1, 17.  In addition, prior to his supervisors learning his sexual orientation and religious beliefs, TerVeer received positive performance evaluations due to the fact that he was performing his job at a level that met his employer's legitimate expectations.

Lastly, TerVeer meets the fourth element of a Title VII discrimination claim because he was treated differently than similarly situated individuals outside of his protected class. Specifically, TerVeer was treated differently from women who preferred male romantic and social partners. Pl. Complaint, generally and, ¶¶10, 12, 13, 20.

Therefore, TerVeer has pled a *prima facie* case of discrimination based on sex because his Complaint sets forth facts that support each element of such a claim.

### b.  The Court is Not Bound By Circuits That Have Excluded Sexual Orientation From Title VII's Protections

TerVeer's Complaint arrives in this Court for the District of Columbia at a unique time, when the country is experiencing an expansion of rights for Lesbian, Gay, Bisexual, and Transgender ("LGBT") individuals and society is generally evolving and recognizing the need to adapt its laws to provide protections for these individuals.  This Court has yet to rule on the issue of sexual orientation inclusion under Title VII and is writing on a clean slate, as an issue of first impression, during this rapidly changing legal environment.  This Court would err if it relied on non-controlling authority without being convinced of the correctness of its holding and its congruence with the logic of U.S. Supreme Court precedent.

The Defendant seeks dismissal based only upon the alleged failure to plead proper evidence of sex stereotyping.  To support its position that sex stereotyping demands allegations relating to how an employee's behavior, demeanor or appearance in the workplace failed to

conform with a particular stereotype, Defendant cites a handful of cases from the 3rd, 6th and 10th Circuits, none of which are controlling precedent for this Court.  Other courts have recognized viable sex stereotyping evidence based solely on the Plaintiff's sexual orientation or gender identity.  Recently these holdings have been bolstered by opinions from the EEOC, which have held that persons discriminated against on the basis of sexual orientation may have valid sex discrimination claims.

The Defendant also cited *Schroer v. Billington,* 424 F.Supp.2d 203 (D.D.C. 2006) as support for its proposition that the Plaintiff failed to sustain a claim of sex stereotyping because of his failure to allege specific allegations about "the employee's appearance or conduct and the employer's stereotypical perceptions."  Def.'s Motion, p. 16.  In *Schroer*, the plaintiff was a transsexual employee candidate with the LOC that was denied employment because she informed the Library's job selection official, prior to beginning work, that she was transitioning from male to female. *Schroer v. Billington,* 424 F.Supp.2d 203 (D.D.C. 2006).  Schroer never completed the hiring process and therefore never exhibited any behaviors, demeanor or appearance in the workplace. *Id*.

However, Defendant fails to cite to the controlling *Schroer* decision.  After issuing its initial opinion in 2006, the court requested additional briefing and issued a subsequent opinion in 2007. *See Schroer v. Billington,* 525 F.Supp.2d 58 (D.D.C. 2007) (Judge Robertson denying the LOC's Motion to Dismiss).  "Because Schroer has stated a Title VII claim based on a sex stereotyping theory, the defendant's Motion to Dismiss must be denied, and it will not be necessary to decide at this time on the alternative theory of her amended complaint, whether discrimination against transsexuals because they are transsexual is literally discrimination because of … sex." *Id.,* at 63.  Following this denial of the LOC's Motion to Dismiss, the court

conducted a bench trial and a third opinion was issued in 2008.  *See Schroer v. Billington,* 577 F.Supp.2d 293 (D.D.C. 2008).  In the 2008 opinion Judge Robertson revisited his prior analysis. "I took the position that 'such a claim must actually arise from the employee's appearance or conduct and the employer's stereotypical perceptions.'  In other words, a [sex stereotyping] claim could not be supported by facts showing that an adverse employment action resulted solely from the plaintiff's disclosure of her gender dysphoria."  *Id.*  Schroer's case indeed rests on direct evidence, and compelling evidence, that the Library's hiring decision was infected by sex stereotypes.  *Id.,* at 304-05.  Judge Robertson also found, on the alternate theory, that Schroer was entitled to judgment based upon the language of the statute itself [by virtue of being transsexual]. *Id.,* at 305-06.

The U.S. Supreme Court does not require that non-conforming behavior or appearance manifest itself in the workplace. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Furthermore, the cases cited by Defendant for this proposition are not controlling precedent on the Court.   The 2008 *Schroer* decision supports a sex-stereotyping claim even when the plaintiff's behavior, demeanor, or appearance failed to manifest in the workplace. *Schroer v. Billington,* 577 F.Supp.2d 293 (D.D.C. 2008).   Additionally, the U.S. District Court for the District of Oregon in *Heller v. Columbia Edgewater Country Club,* 195 F.Supp.2d 1212 (D. Or. 2002), denied summary judgment to a defendant-employer in a sex-stereotyping case where a lesbian plaintiff-employee asserted a discrimination claim based upon the employer's bias against homosexuals without discussing masculine mannerisms that were exhibited in the work place.

> "Viewing the evidence in the light most favorable to plaintiff, a jury could find that Cagle repeatedly harassed (and ultimately discharged) Heller because Heller did not conform to Cagle's stereotype of how a woman ought to behave.  Heller is attracted to and dates other women, whereas Cagle believes that a woman should be attracted to and date only men."

*Id.,* at 1224.

Thus, while this Court is not bound by circuits that have excluded sexual orientation from Title VII's protections, given the changing political climate, this Court should look to the U.S. Supreme Court or to circuits that have given a more broad interpretation to the protections afforded by Title VII.

### c.   The Ultimate Controlling Question Is Whether Gender Was A Factor In The Employment Decision

The U.S. Supreme Court has provided the proper methodology for determining when discrimination because of sex has occurred in violation of Title VII through two landmark cases; *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, (1998), and *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989).  *Oncale* examined the language of Title VII and recognized that courts must consider the plain language of Title VII when determining what constitutes discrimination because of sex, rather than the intent of Congress in 1964. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998).  The *Oncale* Court grappled with whether or not same-sex harassment was included in Title VII's protections and clarified that the protections of Title VII extend beyond original Congressional intent as society's understanding of discrimination likewise evolves. *Id.*  Specifically:

> "As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII.  *But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils*, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.  Title VII prohibits 'discriminat[ion]…because of…sex' in 'terms' or 'conditions' of employment.  Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements."

*Id.,* at 79-80 (emphasis added).

*Price Waterhouse*, a sex-stereotyping case, held that denying a female partner-candidate's promotion because she did not exhibit accepted feminine characteristics was

discrimination based on sex under Title VII. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). The Court looked to the plain language of the statute to determine that in passing Title VII, Congress made the simple but momentous announcement that sex, race, religion, and national origin are not relevant to the selection, evaluation, or compensation of an employee. *Id.,* at 239. "The critical inquiry becomes the one commanded by the words of § 703(a)(1), whether gender was a factor in the employment decision *at the moment it was made." Id.,* at 241. The Court relied on the notion that because sex is linked to gender, Congress intended Title VII to prohibit gender-based discrimination as well as purely sex-based discrimination. *Id.,* at 250-51.

It is important to note that Title VII's prohibition on sex discrimination proscribes gender discrimination, and not just discrimination on the basis of biological sex. *Macy* at *5. If Title VII proscribed only discrimination on the basis of biological sex, the only prohibited gender-based disparate treatment would be when an employer prefers a man over a woman, or vice versa. *Id*. However, the statute's protections sweep far broader than that, in part because the term "gender" encompasses not only a person's biological sex but also the cultural and social aspects associated with masculinity and femininity. *Id*.

The lesson of *Oncale* and *Price Waterhouse* is that if gender played *any* role in the employment decision, discrimination has occurred. *Id.* Accordingly, the Court should look to the Complaint to determine, if as pled, gender played *any* role in the employment decision, and if the Court decides that as pled gender played *any* role in the LOC's employment decisions, dismissing Plaintiff's claim is improper.

### d.  The Concept Of Discrimination Is Constantly Evolving And Laws Continue To Adapt To Societal Perceptions Of Discrimination

In 1964, the social landscape for sexual equality was only beginning to parallel the years-long struggle for racial equality, and the prohibition against discrimination based on sex was

added to Title VII at the last minute on the floor of the House of Representatives receiving little or no debate. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 63 (1986). Since that date, the country's perception of sexual equality has continually evolved and our laws have adapted.

The *Oncale* Court came to the conclusion that Title VII protections encompassed same-sex harassment by looking to the evolution of racial discrimination when it noted that there is no conclusive presumption in the workplace that an employer will not discriminate against members of his own race. *Oncale,* 523 U.S. at 78, (*citing Castaneda v. Partida,* 430 U.S. 482, 499 (1977)). Race discrimination also provides an enlightening parallel to TerVeer's claims. The analysis of race discrimination as applied to interracial couples and friends has necessarily evolved to consider not only the employee's race but also the race of the employee's partner or acquaintance. Similarly, the sex of a homosexual employee's partner or acquaintance should be considered to determine if the employer discriminated against an employee because of sex.

When a white supervisor discriminated against a white employee because that employee chose a romantic partner of a different race it was initially argued that this did not amount to racial discrimination because Congress did not intend to proscribe private employer discrimination on the basis of an individual's association with a member of another race because such discrimination was not based on *that individual's* race. *See Ripp v. Dobbs Houses, Inc.,* 366 F.Supp. 205, 208-09 (N.D.Ala. 1973); *Parr v. United Family Life Ins. Co.,* Civil Action No. C83-26G (N.D.Ga. June 15, 1983)(O'Kelley, J.); *Adams v. Governor's Committee on Postsecondary Education.* 26 Fair Empl.Prac.Cas. (BNA) 1348 (N.D.Ga.1981)(Evans, J.). This is no longer the case in the vast majority of circuits. "Hostile conduct that attempts to sever or punish only those friendships that are interracial might certainly "pollute" [ ] the victim's workspace." *McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1118 (9th Cir. 2004). It follows that,

where an employee is subjected to an adverse action because an employer disapproves of an interracial association, the employee suffers discrimination because of his own race. *Holcomb v. Iona College,* 521 F.3d. 130, 139 (2nd Cir. 2008).

The U. S. Supreme Court has also considered the sex of an employee's partner when analyzing discrimination because of sex under Title VII. Following Congress' amendment of Title VII to prohibit sex discrimination on the basis of pregnancy, the U.S. Supreme Court considered a differential in health coverage between male employees with pregnant wives and pregnant female employees. *Newport News Shipbuilding and Dry Dock Company v. EEOC,* 462 U.S. 669 (1983). Because the insurance benefits for pregnant employees were superior to those offered to dependent women of male employees, the Court determined that the employer discriminated against its male employees with respect to their compensation, terms, conditions, or privileges of employment because of their sex within the meaning of § 703(a)(1) of Title VII. *Id.,* at 675. It follows that this Court should consider the sex of the Plaintiff's preferred partner when determining whether or not adverse employment decisions were based upon an employee's gender or sex.

In denying protection to homosexual employees, some courts have disfavored the creation of a *de facto* amending of Title VII to encompass sexual orientation even in the face of admitted harassment that is socially unacceptable and repugnant to workplace standards of proper treatment and civility. *Vickers v. Fairfield Med. Ctr.,* 453 F.3d 757, 764-65 (6th Cir. 2006). Yet that is exactly how Title VII evolved in the context of sex and racial discrimination with the inclusion of protection for those in interracial marriages and more recently, after *Vickers,* with the inclusion of protection for transsexual employees within sex discrimination through the *Schorer* and *Macy* opinions.

Therefore, this Court should analogize Plaintiff's claim to the evolution of race discrimination and transsexual claims in order to afford Plaintiff with a remedy under Title VII for the discrimination he endured based upon his sex.

### e. The Progeny of Cases Barring Discrimination Based On Sexual Orientation Improperly Rely Upon Perceived Congressional Intent

Circuits that have disregarded discrimination based on sexual orientation, in large part, have relied on their perceived understanding of the intent of Congress in 1964 or subsequent years. *Bibby v. Phila. Coca Cola Bottling Co.,* 260 F.3d 257, 261 (3d Cir. 2001) (citing Congress' rejection of legislation that would have extended Title VII to cover sexual orientation); *Medina v. Income Support Div.,* 413 F.3d 1131, 1135 (10th Cir. 2005)(noting Congress' refusal to expand the reach of Title VII is evidence of Congressional intent); *Rene v. MGM Grand Hotel, Inc.,* 243 F.3d 1206, 1209 (9th Cir. 2001)(relying on the fact that Title VII has not been amended to expressly include sexual orientation); *Simonton v. Runyon,* 232 F.3d 33, 35 (2d Cir. 2000) (citing meager legislative history and rejections by Congress to address sexual orientation in the context of Title VII); *Hopkins v. Balt. Gas & Elec. Co.,* 77 F.3d 745, 749 & n.1 (4th Cir. 1996)(citing the lack of Congressional debate regarding the word 'sex' prior to adopting Title VII); *Williamson v. A.G. Edwards & Sons,* 876 F.2d 69, 70 (8th Cir. 1989)(relying on *DeSantis v. Pacific Tel. & Tel. Co.,* 608 F.2d 327 (9th Cir. 1979) *abrogated by Nichols v. Azteca Restaurant Enterprises, Inc.,* 256 F.3d 864 (9th Cir. 2001) (relying on Congressional intent to restrict the term 'sex' to its traditional meaning); and *Smith v. Liberty Mut. Ins. Co.,* 569 F.2d 325, 326-27 (5th Cir. 1978)(stating Congress by its proscription of sex discrimination intended only to guarantee equal job opportunities for males and females)

*Oncale* rejects this reasoning and demands that the sole inquiry shall be whether or not the discrimination was based on sex. *Oncale* at 79-80.

The U.S. Supreme Court has expressly disfavored discerning legislative intent surrounding the enactment of a statute or from Congress' failure to enact a particular provision.

> [S]ubsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress. It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law. Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction.

*Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 650 (1990) (internal citations and quotation marks omitted).

The concepts espoused in these outdated decisions predate *Schroer* and *Macy,* which expressly include transsexual employees in Title VII despite the previous, almost universal, exclusion of transsexual discrimination. Homosexuality is but another artificial classification that, when applied to block claims for gender discrimination, generally ignores the U.S. Supreme Court's opinions in both *Oncale* and *Price Waterhouse.*

### f. Artificially Excluding Homosexual Employees From Gender Discrimination Creates Irreconcilable Opinions

The reality is that distinctions between gender discrimination and sexual orientation discrimination are difficult to discern, and ambiguities exist when distinguishing the differences. Courts have been inclined to find discrimination based on sex stereotyping and gender non-conformity when the plaintiff claims to be heterosexual, but have denied similar claims when the plaintiff is perceived to be homosexual. *Compare City of Belleville v. Doe by Doe,* 119 F.3d 563 (7th Cir. 1997) (*cert. granted,* judgment vacated by *City of Belleville v. Doe by Doe,* 523 U.S. 1001) (finding that sexual orientation was irrelevant to the inquiry of whether or not the discrimination was based on sex, and that homophobic epitaphs and assaults toward plaintiff established that he did not conform to his co-workers view of appropriate masculine behavior constituting gender harassment, irrespective of perceived or actual orientation), *with Ayala-*

*Sepulveda v. Municipality of San German,* 661 F.Supp. 130 (D. Puerto Rico 2009)(finding that written notes and physical threats were because of the plaintiff's homosexuality and therefore outside of Title VII's protection).

 g. **The EEOC Has Evolved and Is Now Counseling EEO Directors That Employees Who Believe They Have Been Discriminated Against on the Basis Of Sexual Orientation May Have Recourse Under Title VII**

 Further evidence of the evolution of sex-stereotyping claims under Title VII is found in recent and very clear decisions of the EEOC.  Although the courts are not bound by the EEOC's interpretation of Title VII, it is nevertheless appropriate to consider the EEOC's interpretation because of the EEOC's charge to enforce the Act. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986). The facts of *Veretto v. U.S. Postal Service,* EEOC Appeal No. 0120110873 (July 1, 2011); 2011 WL 2663401 (E.E.O.C.) are strikingly analogous to those found here.  Jason Veretto was a postal employee in rural Connecticut whom enjoyed an uneventful workplace until a coworker learned of his sexual orientation when the local newspaper printed an announcement regarding Veretto's impending wedding to his male partner.  Following publication of the announcement the coworker began to harass Veretto, calling him derogatory names associated with homosexuality.  *Id.,* at *1-2.  There were no allegations that. Veretto displayed female or effeminate characteristics in the workplace.  *Id.*  Initially the EEOC dismissed the entire complaint for failure to state a claim, reasoning that Veretto was really alleging discrimination because of his sexual orientation, which is not covered by Title VII. *Id.,* at *3.  Veretto disputed that characterization of his claim, stating that the discrimination was motivated by his coworker's anger over the fact that Veretto was marrying a man, rather than a woman marrying a man.  *Id.* While the Agency agreed that Title VII's prohibition of discrimination does not include sexual preference or orientation as a basis, it did find that Veretto was the victim of sex stereotyping discrimination, citing *Price Waterhouse v. Hopkins,* and the 2008 *Schroer* opinion.  *Id.*  The

37

Agency noted that the discrimination was motivated by the sexual stereotype that marrying a woman is an essential part of being a man, and that Veretto failed to adhere to this stereotype when he announced his marriage to a man in the society page of the local newspaper. *Veretto v. U.S. Postal Service,* EEOC Appeal No. 0120110873, *3 (July 1, 2011); 2011 WL 2663401 (E.E.O.C.). The Agency reversed the dismissal decision and remanded the complaint for further processing. *Id*.

Five months later the EEOC decided the appeal of *Castello v. U.S. Postal Service,* using the same analysis. *Castello v. U.S. Postal Service,* EEOC Request No. 0520110649 (December 20, 2011); 2011 WL 6960810 (E.E.O.C.). The Agency found that derogatory comments regarding the fact that the complainant, Cecile Castello, had sexual relations with other women, rather than with men, alleged a plausible sex stereotyping case that would entitle her to relief under Title VII if she were to prevail. *Id.*, at *2. *see also, Rosa v. Department of Veteran Affairs,* EEOC Appeal No. 0120091318 (August 3, 2009); WL 2513955 (E.E.O.C.)(finding harassment based on gender when coworker used homophobic gestures, mannerisms and verbal mocking towards the complainant).

Title VII has been expanded multiple times by our courts as society's perception of discrimination has evolved. Very recently the EEOC made it clear that its enforcement of Title VII has evolved to the point where persons discriminated against on the basis of sexual orientation may have valid sex discrimination claims. For this reason, the Office of Federal Operations of the EEOC, through formal memoranda advised all federal EEO directors that lesbian, gay and bisexual employees and applicants who believe they have been discriminated against on the basis of sexual orientation should be counseled that they have a right to file a

complaint under the 1614 process of Title VII, as they may have experienced sex discrimination. Ex. 7, Office of Federal Operations Memo to EEO Directors.

Therefore, it would be improper to dismiss TerVeer's Complaint at a time when the EEOC is actively counseling EEO directors that persons discriminated on the basis of sexual orientation may have valid sex discrimination claims under Title VII.

### 2. Religious Discrimination

#### a. Plaintiff's Perceived Religious Shortcomings Played A Motivating Role In The Adverse Employment Actions And The Creation of A Hostile Work Environment

The Plaintiff suffered discrimination at the hands of the Defendant because he failed to live up to his supervisor's religious expectations.  The Plaintiff's claim is not one alleging the LOC's failure to accommodate the practice of his religion, rather it is a claim based upon his being discriminated against for failure to adopt or comply with his supervisor's religious beliefs. What matters in this context is not TerVeer's religious beliefs, but rather the Defendant's asserted perception that TerVeer did not share the same beliefs as the Defendant.  *see Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997).  The Plaintiff need not label his beliefs or demonstrate that he communicated his religious status to the Defendant. *Id.*  He must only show that his perceived religious shortcomings played a motivating role in his discharge. *Id.*

The criterion for determining if the perceived religious shortcomings played a motivating role are evaluated in the same way that a plaintiff would prove that any other statutorily proscribed factor was at least a motivating factor in the adverse employment action. *Id., at 973 citing Terbovitz v. Fiscal Court of Adair County, Ky.,* 825 F.2d 111, 115 (6th Cir. 1987).  To state a claim for religious discrimination, Plaintiff can prevail under Title VII so long as an illicit criteria played a motivating role in the adverse employment action, even if another, legitimate criteria also played a role. *Venters* at 973, n.7.

**b.  Plaintiff Adequately Pled Facts In Support of His Perceived Religious Shortcomings Being At Least A Motivating Factor In The Adverse Employment Action**

Plaintiff pled throughout his Complaint specific instances where Mech voiced perceived shortcomings regarding TerVeer's religious beliefs.  Initially, it is alleged that Mech is a religious man accustomed to making his faith known in the workplace, and that he interjects a non-secular tone into his written and oral communications. Pl. Complaint, ¶8.  Even prior to learning of TerVeer's sexual orientation, Mech was incanting his desires to bring TerVeer closer to God and to save his worldly behind. Pl. Complaint, ¶8.  After learning of TerVeer's sexual orientation the religious pressures intensified. Pl. Complaint, ¶¶ 12, 14, 18, 19, 57, 66 and 67.  In addition, the Complaint points out that Mech and TerVeer often argued regarding the fact that TerVeer did not hold the same religious beliefs as Mech. Pl. Complaint, ¶¶ 20, 21, 22 and 27.  When TerVeer confronted Mech regarding their divergent religious beliefs and how they were affecting his employment, Mech admitted to being "damn angry" and referred to his supervisory role over TerVeer as a dictatorship. Pl. Complaint, ¶ 27.  The Complaint alleges that the religious discrimination was pervasive and substantial, and that because of the religious discrimination, TerVeer was subjected to a hostile work environment and was constructively terminated in violation of Title VII. Pl. Complaint, ¶¶ 67,68,69.

Defendant's motion to dismiss does not necessarily challenge the sufficiency of TerVeer's religious discrimination claim, rather the motion erroneously accuses TerVeer of repackaging a defective sex orientation claim as a religious discrimination claim, relying on *Prowl v. Wise Bus. Forms.* 579 F.3d 285 (3d Cir. 2009).

### c. *Prowl* Is Not Controlling Authority And Is Inapplicable To This 12(b)(6) Posture

Plaintiff has provided a thorough response to Defendant's claims that discrimination based upon sexual orientation is *per se* excluded from Title VII by demonstrating that the circuits that have come to that conclusion have done so by improperly looking to Congressional intent in 1964 and beyond in a failed attempt to determine the meaning of a statute that has admittedly evolved over time. This analysis applies equally to discredit *Prowl v. Wise Bus. Forms*. The *Prowl* Court looked to *Bibby v. Phila. Coca Cola Bottling Co.* and its proposition that Congress's repeated rejection of legislation that would have extended Title VII somehow creates an exception for homosexual employees that is not present in the plain reading of Title VII. *Prowl*, 579 F.3d at 293[7]. This type of clairvoyancy is rejected by *Oncale* and *Pension Benefit Guaranty Copr. v. LTV Corp.*

Prowl is a Third Circuit opinion reviewing the lower court's granting, in its entirely, of the employer's motion for summary judgment on the issues of sex stereotyping and religious discrimination under Title VII. Brian Prowl was a homosexual male who experienced verbal abuse, written attacks, public placement of gay-related paraphernalia, graffiti, anonymous prayer notes and religious writings. *Prowl v. Wise Bus. Forms,* 579 F.3d 285, 287-88 (3d Cir. 2009). The court of appeals reversed summary judgment on the sex-stereotyping claim but affirmed the lower court's denial of the religious discrimination claim, asserting it was just repackaging of an impermissible claim based on sexual orientation. *Id.,* at 291, 293. Without providing additional argument regarding *Prowl's* improper reliance on *Bibby,* the fact remains that *Prowl* was the

---

[7] It bears note that the Defendant places great emphasis on Congress's intent based upon meager legislative history and subsequent Congressional inaction, but fails to recognize Congress's ability to expressly carve out exceptions to other similar statutes. Congress specifically excluded homosexuality and bisexuality from the list of impairments that constitute a disability under the Americans with Disabilities Act. *See* 42 U.S.C. § 12211(a).

review of a summary judgment order with the benefit of a full record.  The court "reviewed the record" in coming to the conclusion that Brian Prowl could not satisfy the first essential element of his cause of action, that he was harassed based on *his* religious beliefs.  *Prowl* at 292.

This Court cannot reach that same conclusion at the pleading stage.  In fact, TerVeer has pled several instances that, if taken as true, refute the Defendant's characterization that TerVeer's religion claim is identical to his sex discrimination claim.  TerVeer alleges that Mech engaged in religious lectures prior to learning of his sexual orientation. Pl. Complaint, ¶8.  He further alleges that Mech was a religious man who interjected a non-secular tone into his written and oral communications. Pl. Complaint, ¶8.  At the beginning of almost every work-related conversation, Mech would engage in a religious lecture. Pl. Complaint, ¶12.  TerVeer endured religious diatribes. Pl. Complaint, ¶14.  There were several discussions between Mech and TerVeer regarding the differences between their faiths. Pl. Complaint, ¶¶ 20, 21, 22, 27.  Not until after discovery will the Court have the benefit of weighing the evidence to determine if Mech's religion was a motivating factor in the adverse employment actions.

The current posture of this case is more aligned with *Gadling-Cole v. West Chester University,* 868 F.Supp.2d 390 (E.D. Penn. 2012).  Gadling-Cole, a professed heterosexual and conservative Baptist, alleged her LGBT-friendly employer discriminated against her because of a single religious belief, that a man should not lay with a man. *Id.,* at 396.  She further claimed that she was targeted for discrimination because she refused to support or advocate on the part of the LGBT community due to this single religious ground. *Id.*  In ruling upon the employer's 12(b)(6) motion, seeking dismissal on the theory that Gadling-Cole could not maintain her religious discrimination claim because it was nothing more than an impermissible sex-orientation claim, the court professed, that given the 12(b)(6) posture it did not have the benefit of discovery to

determine whether the plaintiff was discriminated against because of her Baptist religion or, rather, was disliked because of her personal animosity towards the LGBT community. *Id.,* at 397. Likewise, without the benefit of discovery, it cannot be determined if Mech was infusing the workplace with his religious beliefs because of his desire to discriminate against TerVeer due to his homosexuality alone or perhaps a mix of his disgust with TerVeer's general support of the LGBT community, his embarrassment over trying to set TerVeer up with his daughter, or other factors that will remain unknown until after discovery.

*Erdmann v. Tranquility, Inc.,* predates *Prowl* and without discussing the possibility that a homosexual's religious discrimination claims are nothing more than an attempt to bootstrap an improper sexual orientation claim, allowed the plaintiff to bring a Title VII religious discrimination action stemming from harassment that occurred after his sexual orientation became widely known at work. *Erdmann v. Tranquility, Inc.,* 155 F.Supp.2d 1152 (N.D. Ca. 2001). The *Prowl* court dug deep into the *Erdmann* opinion to distinguish its holding, and focused on two discrete facts. First, that prior to Erdmann's being exposed as a homosexual, he was "on more than one occasion" asked to lead a prayer at a morning meeting of employees. *Id.,* at 1158. On one occasion, after being exposed as a homosexual, his employer told the plaintiff that it is immoral to be a homosexual, and that he should become heterosexual and a Mormon or he would go to Hell. *Id.,* at 1156. The record discloses that at the time he was asked to lead the prayers (prior to November 1998) he was happy at work. *Id.,* at 1155. The statement regarding conversion was a single episode. *Id.,* at 1156. These facts appear immaterial to the *Erdmann* court as the single stated precipitating allegation is that his supervisor, who was a member of the Mormon Church, discriminated against him and created a hostile and abusive work environment based on religion – namely, her belief that homosexuality is immoral. *Id.,* at 1152. The Third

Circuit, eight years later, placed great emphasis on these two events, all but ignoring the similarity these facts had with those of Brian Prowl.

> "Wholly apart from the fact that it is not binding precedent, *Erdmann* cannot bear the weight Prowl places on it.  Unlike Prowl, Erdmann did not claim Title VII religious harassment based exclusively upon his homosexual status.  Rather, the employer in that case insisted that Erdmann covert to the employer's faith and lead the company's daily prayer service."

*Prowl v. Wise Bus. Forms,* 579 F.3d 285, 293 (3d Cir. 2009).

Certainly it is clear that the allegations in the Plaintiff's Complaint offer independent grounds similar to and beyond those identified in *Erdmann* and seized upon by *Prowl*.  Similar to the daily prayers that Erdmann endured prior to his exposure as a homosexual, before learning of TerVeer's homosexuality, Mech routinely made his faith known in the workplace, he kept his Bible on his desk, and on at least one occasion sought to put TerVeer closer to God and to save his worldly behind. Pl. Complaint, ¶8.  While Erdmann was made to listen to his supervisor utter a single sentence explaining he would go to Hell if he did not convert to the Mormon faith and become a heterosexual, TerVeer endured more than an hour of being "educated" on Hell, that it is a sin to be a homosexual, he was going to Hell, and Mech admonished him to repent. Pl. Complaint, ¶18.  Under a *Prowl* analysis, TerVeer's complaint clearly demonstrates that his Title VII religious claim is not based exclusively upon his homosexual status.

*Prowl* was wrongly decided, is not controlling authority and lacks precedent in this Court.  Further, it is inappropriate to dismiss the Plaintiff's claims of religious discrimination until a full record is compiled and analyzed to determine if Mech perceived shortcomings in TerVeer's religious beliefs and whether those shortcomings played a motivating factor in any adverse employment actions.

### 3. Retaliation

In order to sustain a claim of retaliation under Title VII, a Plaintiff must demonstrate that: (1) he was engaged in protected activity or that he opposed practices made unlawful by Title VII; (2) the employer took an adverse personnel action against him; and (3) a causal connection existed between the protected activity and the adverse employment action. *Howard University v. Green*, 652 A.2d 41 (D.C. App. 1994).

The first element is comprised of Title VII's "opposition clause" and "participation clause." *Crawford v. Metropolitan Government of Nashville and Davidson Country, Tenn.*, 555 U.S. 271, 271 (2009). Under either of these provisions of Title VII, "it is unlawful for an employer to discriminate against any employee who (1) has opposed any practice made an unlawful employment practice by [Title VII] (opposition clause), or (2) has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII] (participation clause)." *Id.* (citations omitted). Also with regard to the first element, the Plaintiff only needs to prove that she had a reasonable good faith belief that the practice she opposed was unlawful under Title VII, not that it actually violated it. *Howard Univ. v. Green*, 652 A.2d 41, 44-45 (D.C.App. 1994).

Defendant has moved to dismiss Plaintiff's retaliation claim for "all allegedly retaliatory actions that pre-date March 16, 2011," arguing that Plaintiff solely alleged that he began opposition activity on June 25, 2010, Pl. Complaint, ¶20, and began participation conduct on March 16, 2011; *Id*. Def.'s Motion, p. 18. Defendant has argued that Plaintiff's Complaint does not assert that TerVeer engaged in activity covered under the "participation clause" prior to March 16, 2011, or under the "opposition clause" prior to June 25, 2010. Defendant further argues that Plaintiff's activities beginning June 25, 2010 do not fall under the "opposition

clause" of Title VII because he could not have reasonably believed that a complaint of discrimination based on sexual orientation is covered under Title VII.

However, Plaintiff asserted that he engaged in activity covered under the "opposition clause" beginning on June 25, 2010. Pl. Complaint, ¶¶ 20, 21, 23, 24. Plaintiff's opposition activity falls within the scope of the "opposition clause" for two reasons. First, Plaintiff opposed Mech's conduct, which discriminated against him based upon his religious beliefs *and* sexual orientation. "TerVeer explicitly told Mech that he believed his poor review was based upon their divergent religious beliefs." Pl. Complaint, ¶ 21. In addition, Plaintiff alleged that he "directly questioned Mech regarding the purpose of the continuous religious lecturing and unfair treatment that began after Mech learned TerVeer was homosexual." Pl. Complaint, ¶ 20.

While Defendant fails to address the fact that Plaintiff's Complaint asserts that he engaged opposition activity to oppose the discrimination based upon religion, Defendant hones in on the fact that Plaintiff opposed Mech's discrimination based on sexual orientation, arguing that opposing discrimination based on sexual orientation is not protected under Title VII. As discussed above, Plaintiff alleged facts in his Complaint to support the contention that he opposed discrimination on both bases, religion *and* sexual orientation. Discrimination based on religion is plainly within the scope of Title VII, and accordingly, it is very clear that this opposition activity pled in Plaintiff's Complaint falls within the scope of the "opposition clause." With regard to discrimination based on sexual orientation, as discussed in *Howard Univ. v. Green*, the plaintiff needs only a good faith, reasonable belief that the act to which they are opposing is covered under Title VII. *Howard Univ. v. Green*, 652 A.2d 41, 44-45 (D.C.App. 1994). As argued *supra* 25-38, the landscape has been changing with regard to how certain discrimination claims based on sexual orientation may be covered under Title VII. While some

claims are covered as discrimination based on sex, others are not.  TerVeer is not an attorney, and he does not understand the intricacies of the legal framework that underlies the distinctions. Accordingly, he had a good faith, reasonable belief that he might be covered under Title VII, as being a male that was discriminated against because he chooses partners that are not females, which goes against the stereotype[8] that all males chose partners that are female.  Additionally, there is EEOC guidance suggesting that complainant's alleging discrimination based on sexual orientation should be directed by federal EEO offices to file charges of discrimination, which could have given TerVeer a reasonable belief that his claim was protected under Title VII. *Supra*, 36-38.  Lastly, the LOC policies in and of themselves prohibit discrimination based on sexual orientation, which reinforced TerVeer's belief that he was opposing conduct that is protected under Title VII.

Plaintiff's Complaint does discuss additional instances of opposition activity that he engaged in.  Plaintiff's Complaint states that on June 29, 2010, he met with Mech's supervisor, Christopher, to report that he believed he was the victim of discrimination in the workplace because of his sexual orientation *and* differing religious beliefs. Pl. Complaint, ¶¶ 23, 24. Plaintiff's Complaint asserts that, on February 22, 2011, Plaintiff reached out to Christopher again to state that he felt he might be retaliated against. Pl. Complaint, ¶30.  On March 14, 2011, TerVeer engaged in protected activity when he informed EEO counselor Diamond of the discrimination that he had been experiencing. Pl. Complaint, ¶ 33.  Plaintiff then asserts that he engaged in participatory conduct.  Specifically, Plaintiff's Complaint states that on March 16, 2011, he again reported the discrimination that he endured, this time to Earp, the Director of the OIC.  The act of reporting Mech's discriminatory conduct to Christopher constitutes opposing a

---

[8] Stereotype: something conforming to a fixed or general patter; *especially*: an often oversimplified or biased mental picture held to characterize the typical individual of a group. "Stereotype," *Merriam-Webster.com*. 2013. http://www.merriam-webster.com/medical/stereotype?show=1&t=1362018336  (27 Feb. 2013).

practice made unlawful by Title VII, and reporting the discrimination to Diamond and Earp constitutes protected activity. Therefore, Plaintiff has satisfied the first element of retaliation because he engaged in protected activity as early as June 25, 2010.

Plaintiff satisfies the second element of a retaliation claim, as he suffered adverse actions. *Supra*, 26. As discussed, *supra*, Plaintiff was denied promotions and WIGIs, and he was constructively terminated.

Plaintiff satisfies the third element of a retaliation claim, as he made several allegations in his Complaint setting forth a causal connection between his protected activity and opposition of Mech's unlawful practices, with the LOC's adverse employment action. There is a close proximity between the protected activity and adverse actions. Within days of reporting discrimination to Christopher, Mech began treating TerVeer differently from his peers, and began to verbally assault him. Pl. Complaint, ¶¶ 23-26. Further, within six months of Plaintiff reporting the discrimination to Christopher, Plaintiff received a negative performance evaluation. Pl. Complaint, ¶¶ 23-27. Within three months of reporting discrimination and harassment to Earp, Plaintiff received a negative evaluation. Pl. Complaint, ¶¶ 33-36. The close temporal proximity between TerVeer's engaging in protected activity and opposition of unlawful practices with the adverse employment actions he suffered demonstrate the requisite causal connection.

After a plaintiff has established a *prima facie* case of discrimination, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action." *RAP, Inc., v. D.C. Comm'n on Human Rights*, 485 A.2d 173, 176 (D.C.1984) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant articulates a legitimate, nondiscriminatory reason for the employment action then "the plaintiff must show that the employer's proffered reason was in fact a pretext for discrimination." *Id*. A plaintiff

"may prove pretext either directly by persuading the court that a discriminatory reason more than likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*, 176-177 (citing *Tex. Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 256 (1981). Defendant, however, has failed to assert a legitimate business reason for its termination of Plaintiff.[9]

Therefore, Plaintiff is able to sustain a claim for retaliation based upon the facts asserted in his Complaint.

### 4. Hostile Work Environment

A plaintiff has a viable hostile environment claim under Title VII where the plaintiff can demonstrate: "(1) that he is a member of a protected class, (2) that he has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition or privilege of employment." *Lively v. Flexible Packaging Assoc.*, 830 A.2d 874, 888 (D.D.C. 2003). In order to prove the fourth element, the harassment must be sufficiently severe and pervasive such that a trier of fact could find that the conduct demonstrates an objective and subjective pervasive pattern of unacceptably abusive behavior. *Nicola v. Wash. Times Corp.*, 947 A.2d 1164, 1173 (D.D.C. 2008) (accord *Daka, Inc. v. Breiner*, 711 A.2d 86, 92 (D.D.C. 1998)); *Lively v. Flexible Packaging Assoc.*, 830 A.2d 874, 889 (D.D.C. 2003).

"In a sexual harassment case involving the claim of hostile work environment, the burden on the defendant employer is markedly heavier [than in a gender discrimination claim]. Once a plaintiff has established a *prima facie* case of sexual harassment or retaliation for opposing sexual harassment, the burden shifts to the employer to rebut the plaintiff's harassment claims

---

[9] Should Defendant provide the Court with a legitimate, nondiscriminatory business reason for its termination of TerVeer in its Reply to this Opposition brief, the Plaintiff respectfully requests that the Court allow Plaintiff to file a sur-reply to address the proffered reason.

and to show by clear and convincing evidence that the plaintiff would not have been treated differently if she had not opposed the harassment." *Broderick v. Ruder*, 685 F.Supp.1269 (D.D.C. 1988) (citing *Bundy,* 641 F.2d at 952-53; *Day v. Mathews,* 530 F.2d 1083, 1085 (D.C. Cir. 1976). "Once a plaintiff establishes that she was harassed…it is hard to see how an employer can justify [the] harassment." *Broderick v. Ruder*, 685 F.Supp.1269 (D.D.C. 1988) (citing *Moffett v. Gene B. Glick Co., Inc.*, 621 F.Supp.244, 266 (N.D. Ind. 1985).

It has already been established that TerVeer is a member of a protected class, *Supra* 25-26, 38-39.  With regard to the second element, Plaintiff's Complaint states several instances of unwelcomed harassment that he endured. *See* Pl.'s Complaint, ¶¶ 12, 18, 19, 27, 36, 41-43, 46, 48, 51, 54. Plaintiff demonstrated he was subject to unwelcomed harassment based on his protected class, which is demonstrated in the very nature of the type of harassment that he endured: he was made to listen to religious speeches and indoctrinations, and he was continuously spoken to in a hostile, insulting, and intimidating manner by Mech based on his sex and religious difference. Pl. Complaint, ¶¶12, 18, 19, 27, 36, 41-43, 46, 48, 51, 54.

Plaintiff's Complaint details the pervasive and hostile environment the Plaintiff endured at the LOC at the hands of his supervisors Mech and Christopher. Pl. Complaint, ¶¶1, 8, 12, 16-19, 21, 26-29, 37-39, 41-43, 45, 46, 48, 51, 54.   When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.  *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78, (1998).  The harassment that Plaintiff endured was so stressful that it required him to seek counseling and medical treatment.  In addition, the very fact that Christopher followed TerVeer to videotape him outside of his employment is objectively and subjectively severe and pervasive. Pl. Complaint, ¶43.

Plaintiff has therefore made a *prima facie* showing of a claim for hostile work environment.

## C. Constitutional claims

Defendant has argued that Plaintiff's claims are precluded due to the fact that he has standing to bring Title VII claims of discrimination; however, that argument fails.  This Court has "intimate[d] no view as to the likelihood that the [plaintiffs] will prevail on constitutional claims for which Title VII could not provide a remedy.  We do, however, hold that Congress did not intend for Title VII to displace those claims." *Ethnic Employees of the Library of Congress v. Boorstin*, 751 F.2d 1405, 1416 (D.C. Cir. 1985); see also *Clark v. Library of Congress*, 750 F.2d 89 (D.C.Cir. 1984) (adjudicating Library of Congress employee's constitutional and employment discrimination claims without even suggesting that claims other than those that could be brought under Title VII were precluded by *Brown*).  As the D.C. Circuit explained:

> "Brown's inquiry into the legislative history of section 717 focused on whether federal employees should be able to bring *parallel* actions under both Title VII and other provisions of federal law to redress the same basic injury.  Nothing in that history even remotely suggests that Congress intended to prevent federal employees from suing their employers for constitutional violations against which Title VII provides no protection at all."

*Boorstin,* 751 F.2d at 1416 (emphasis added).

Other courts have confirmed that federal employees may bring claims under the Constitution for types of discrimination that are not covered by other, more specific, statutes.  *See, e.g., Ray v. Nimmo*, 704 F.2d 1480, 1485 (11th Cir. 1983) (per curiam) (holding that Title VII and the ADEA were the exclusive mechanisms for addressing sex and age discrimination, but other types of constitutional violations could be addressed through "direct action under the equal protection 'component' of the Fifth Amendment due process clause.").

Therefore, while Title VII provides the exclusive remedy for federal employees who suffer discrimination on one of the grounds identified in that statute, it does *not* preclude claims for other kinds of discrimination left unaddressed by Title VII.

### D.  Plaintiff's Non-Monetary Claims Survive Sovereign Immunity

TerVeer prays for various types of relief in his Complaint, including monetary and non-monetary.  Pl. Complaint, ¶¶ 109, p. 22.  Plaintiff seeks declaratory relief, including but not limited to  a declaration that Defendant's actions violate … the Library of Congress Act, Special Announcements 10-5, 11-02, and LCR 2010-2, 2023-1 and 2023-2.  Plaintiff also seeks injunctive relief, including but not limited to reinstatement and an order restraining Defendant from engaging in further discriminatory conduct of the types of which Plaintiff complains. Pl. Complaint, Prayer (b), page 23. Plaintiff further seeks any additional relief, as justice allows. Pl. Complaint, Prayer (i), page 23.

While it is true the LOC can claim immunity from suits seeking money damages, sovereign immunity does not extend to cases seeking non-monetary relief.  "It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority."  *Clark v. Library of Congress,* 750 F.2d 89, 102 (D.D.C. 1984), *See Malone v. Bowdoin,* 369 U.S. 643, 646-48 (1962).

## VI.  Conclusion

Plaintiff demonstrated that this Court has appropriate jurisdiction over each of his claims and that his Complaint alleges sufficient facts to state a proper claim for each cause of action asserted.  Plaintiff's Complaint certainly sets forth more than the required short and plain

statement of the claims and undoubtedly provides the Defendant with fair notice of each claim and the grounds upon which each is based.

      **WHEREFORE**, the Court should deny the Defendant's Motion to Dismiss.

February 28, 2013                      Respectfully submitted,


                      _____*/s/ Christopher M. Brown*_____
                      CHRISTOPHER M. BROWN
                      DC Bar # 502421
                      Glen H. Ackerman
                      DC Bar # 474793
                      ACKERMAN BROWN, PLLC
                      1250 Connecticut Ave., NW #200
                      Washington, DC 20036
                      Tel:  202-393-5428
                      Fax:  202-355-6489
                      *chris.brown@ackermanbrown.com*
                      *glen.ackerman@ackermanbrown.com*

                      Counsel for Plaintiff, Peter J. TerVeer


                      _____*/s/ Thomas J. Simeone*_____
                      THOMAS J. SIMEONE
                      DC Bar # 433425
                      Simeone & Miller LLP
                      1130 Connecticut Ave., NW, #350
                      Washington, DC 20036
                      Tel: 202-628-3050
                      Fax: 202-466-1833
                      *TSimeone@SimeoneMiller.com*

                      Counsel for Plaintiff, Peter J. TerVeer